## CARL ZIEGLER v. DENVER HOG SERUM COMPANY AND OTHERS.[1]

December 23, 1938.

No. 31,801.

[1]Reported in 283 N. W. 134.

*John E. Regan,* for appellants.
*Frundt & Morse,* for respondent.

JULIUS J. OLSON, JUSTICE.
Defendants the Denver Hog Serum Company and Clayton Ankeny

have appealed from a judgment. Western Casualty & Surety Company was eliminated by direction of verdict.

The action was brought to recover damages upon the claimed negligence on the part of the serum company's alleged agents in vaccinating plaintiff's hogs against the ailment known as "hog cholera." Sixty of his hogs were so vaccinated. Shortly thereafter 42 of them died. The remaining 18 ultimately recovered, but plaintiff claimed he incurred expense and suffered other losses because as to them it required extra care and work on his part to cure them; also that they lost weight. The amount of the verdict is not here involved so no further mention need be made in that respect.

The serum company has its principal office and place of business in Denver. It is engaged in the manufacture and sale of hog cholera virus and serum as well as other products. It is licensed to do business in this state and during the time here material was so licensed and so doing business. One C. A. King maintained a place of business for the sale and distribution of its products at Mankato. The business there conducted was under the name of "Denver Hog Serum Company," painted in large letters on the building. The bank account was carried in the company's name, and checks received were made payable to it. The indorsements on checks received were made by a rubber stamp reading, "Denver Hog Serum Company, C. A. King, Manager, 524 West Front Street, Mankato, Minnesota." The Denver office of the company knew of the lettering on the building. King was also its resident agent for service of process as appears from the return of service by the sheriff, attached to the summons. Mr. Devereau was and for more than ten years had been the regional representative of the company at Omaha. His territory included this state. Local dealers in his territory were under his charge and subject to his supervision. He knew King operated under the company's name and held himself out to the public as manager of the Minnesota branch of the company's business in this state.

Defendant Ankeny sold the company's products rather extensively in and around Blue Earth. One Dr. Haskins, a resident of Iowa, was licensed to practice his profession as a veterinarian in

that state but had failed to pass the examination so to practice in Minnesota. King, Ankeny, and the doctor are in the picture as will hereafter appear. A few days prior to August 1, 1936, Ankeny came to plaintiff's farm and, assuming to act and speak in the company's behalf, solicited the job of vaccinating plaintiff's hogs, stating that he had "some of the head men" from this company to do "the work." On August 1, King, Dr. Haskins, and Ankeny came to plaintiff's farm. Mr. King and the doctor were introduced to plaintiff by Mr. Ankeny as the men who would do the job for the company. They arrived there on the afternoon of that day. The hogs were vaccinated by these men. When the work was finished plaintiff asked King to "figure up the bill," handing his checkbook to King. King wrote the check, and plaintiff, before signing it, wrote on it, "vaccinating hogs." The check was drawn payable to "Denver Hog Serum Company" and was indorsed in that manner by Mr. King, as manager. These men had vaccinated several hundred head of hogs that day for other farmers. Checks similarly made payable to the serum company also were given by these farmers to King and deposited in the Mankato bank by him to the credit of that company. That was his customary way of doing business. In settling with the farmers for this work no separation was made respecting the cost or price of the material used and the work performed by these men. It was all lumped together, and, as far as the record shows, not a single one of these farmers knew or suspected that there was any division between the fees of the doctor for administering the serum and virus and the cost of such items.

The serum company's territory is a wide one. It has a branch office at Cedar Rapids, Iowa. And, as we have seen, it has a field representative at Omaha, Mr. Devereau. He well knew that King had "held himself out as the manager of the Minnesota branch" of the company and that he had done so ever since starting his business there. King in his testimony said, "Well, I run this branch in Mankato." He also testified that he kept the bank account in the name of the company, drew checks thereon, and used the mentioned indorsement stamp when indorsing checks received in the business.

In this connection it is interesting to note that defendant put in

evidence (defendant's exhibit A) eight sheets of invoices for goods ordered, each containing the following printed heading:

"Western
"Quality
### "THE DENVER HOG SERUM CO.
"Minnesota Branch, 524 W. Front St. Mankato, Minn.

"SHIP TO ........................... Date ...............
"Address ....................... Ship Via............
"How Shipped ......."

When these parties came to plaintiff's farm the weather was and had been very hot, the thermometer registering a temperature of 118 degrees Fahrenheit in the sun. There is testimony to the effect that the serum had not been kept in a cool place, contrary to the regulations of both federal and state requirements. There is also testimony to the effect that Mr. King made the remark before proceeding with the job of vaccination that he doubted if there was enough serum left to vaccinate plaintiff's hogs properly, they having vaccinated six other herds on that day before reaching plaintiff's farm.

Vaccination has for its purpose the creation of immunity from hog cholera. It consists of injecting virus into the hog, thereby creating cholera, and simultaneously an injection of serum is made which has for its purpose the counteracting of the virus, thereby creating in the animal treated the immunity sought.

■ Defendants urge failure of proof on plaintiff's part in respect to his claim that there was an insufficient amount of serum used or that the serum lacked potency. As we have seen, the purpose of injecting serum is to counteract the virus of cholera. If an insufficient amount is used or if it is impotent, clearly, according to the testimony of plaintiff's experts, cholera would follow. The hogs died from that cause shortly after their vaccination. At the time of vaccination and prior thereto they were and had been to all appearances well and thriving. An attentive examination of the record on this phase convinces us that there was a jury question as to

both. If either lack of potency or an inadequate amount of serum was used a verdict for plaintiff would be sustainable.

■ It is said that the negligent act complained of is *ultra vires* respecting the corporate defendant. Of course as to defendant Ankeny this does not enter into the case. His liability is, we think, established, and as to him there must be an affirmance in any event.

As to the corporate defendant, the law respecting *ultra vires* as a defense is well and accurately stated in 14A C. J. pp. 769-770 (§ 2831) 3, as follows:

"A corporation cannot, in order to escape liability for the wrongful acts of its agents or employees, assert that such acts were beyond the scope of its corporate power or that they occurred in connection with a transaction beyond the scope of such power. In dealing with this question it is to be kept in mind that all torts are necessarily ultra vires, since if an act is authorized by a valid statute it is for that reason lawful and not a tort."

The supporting cases are found under note 99 on p. 769, and under note 1, p. 770.

■ The real problem in this case relates to the question of agency. Does the record sustain a finding that the corporate defendant is bound by the acts of King, Ankeny, and Dr. Haskins, or any of them? In other words, were the acts of these men, or any of them, in vaccinating plaintiff's hogs, the acts for which the corporate defendant can be held liable?

Here, as in Dehnhoff v. Heinen, 202 Minn. 295, 299, 278 N. W. 351, 353:

"The principle here involved can best be stated in the language of Mr. Justice Mitchell in Burchard v. Hull, 71 Minn. 430, 435, 74 N. W. 163, 164: 'It is axiomatic in the law of agency that no one can become the agent of another except by the will of the principal, either express or implied from the particular circumstances; that an agent cannot create in himself an authority to do a particular act merely by its performance. It is equally axiomatic that the extent of the authority of an agent also depends upon the will

of the principal, and that the latter will be bound by the acts of the former only to the extent of the authority, actual or apparent, which he has conferred upon the agent.' "

■ The corporate defendant earnestly urges, and the testimony of its officers is to the effect, that it had no knowledge of King's conduct or activities in respect to acceptance of checks made payable to it, the depositing of such to its credit in banks, withdrawal thereof by him as its manager, or his activity in respect of doing such jobs as are involved here. There is no denial, however, that Mr. Devereau knew that King was holding himself out to the public as the general representative of defendant in Minnesota. We have related all the other material facts the jury could find in respect to plaintiff's claims, and see no need of further elaborating them. So the question still remains whether these are sufficient to sustain the verdict of the jury finding liability.

"On the question of authority of an agent of a business concern, the party dealing with him may prove the course and manner of business in that concern as connected with such agent, from which actual authority may be implied, though the party did not know of such course and manner of business at the time of dealing with the agent." Columbia Mill Co. v. Nat. Bank of Commerce, 52 Minn. 224, 53 N. W. 1061.

And in Best v. Krey, 83 Minn. 32, 34, 85 N. W. 822, this court expressly quoted with approval the mentioned paragraph. A corporation must act through human agencies. That King was defendant's representative for many purposes is apparent. Upon the facts here presented, it may well be said that "actual authority may be authority implied in fact" and as such may be "circumstantially proved." National Radiator Corp. v. Shea, 182 Minn. 342, 343, 234 N. W. 648, 649. (Many cases are there cited sustaining the quoted language.) And here, as in that case, "the question of authority in the agent was for the jury * * *."

■ In Fowlds v. Evans, 52 Minn. 551, 563, 54 N. W. 743, 746, this court quoted with approval from Reynolds v. Collins, 78 Ala. 94, as follows:

"As a general rule the fact of agency cannot be established by proof of the acts of the professed agent in the absence of evidence tending to show the principal's knowledge of such acts, or assent to them; yet when the acts are of such a character and so continued as to justify a reasonable inference that the principal had knowledge of them, and would not have permitted them if unauthorized, the acts themselves are competent evidence of agency."

■ The distinction between proof of agency and the extent of granted authority is not always observed in the cases. This was pointed out by this court in Lee v. Peoples Coop. Sales Agency, Inc. 201 Minn. 266, 268, 276 N. W. 214, 216, as follows:

"Much of this confusion probably results from the fact that very often the evidence tending to prove the existence of an agency is also evidence of the nature and extent of the agent's authority. Before any question of actual authority arises, however, it must first be determined whether a principal and agent relationship in fact exists. If it does not, no question of actual, as distinguished from apparent, authority is involved."

■ ▪ While this case is close to the border line, we think there is sufficient evidence in the record to make the question of agency one of fact for the jury, and that the evidence reasonably sustains the verdict.

The judgment is therefore affirmed.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.