JEAN R. BROWN, APPELLEE, v. GLOBE LABORATORIES, INC., A CORPORATION, APPELLANT, IMPLEADED WITH FRANK A. JELEN ET AL., APPELLEES.

84 N. W. 2d 151

Filed July 12, 1957. No. 34148.

*George W. Becker, William P. Mueller,* and *George L. DeLacy,* for appellant.

*Harold A. Prince* and *Gross, Welch, Vinardi & Kauffman,* for appellee Brown.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Douglas County. It involves an action brought by Jean R. Brown against Globe Laboratories, Inc., a corporation; Frank A. Jelen; and Dr. Jelen's Veterinary Supply Corporation, a corporation. The action is based on alleged breaches of express and implied warranties of a product, Clostridium Perfringens Type D Bacterin, produced and put on the market by defendant Globe Laboratories, Inc., to be used for the prevention of Enterotoxemia in sheep. Plaintiff alleges he used it for that purpose on a large number of lambs and claims its use resulted in the death of 2,138 of the lambs he caused to be vaccinated therewith and in serious injury to a large number of the balance all because, as he claims, the bacterin used was not fit to immunize the lambs from Enterotoxemia and also because it was contaminated with some foreign substance which was injurious and poisonous to his lambs. He claims damages because of the death and injuries to his lambs which he alleges resulted from the use of this bacterin to vaccinate his lambs. Trial was had. A jury returned its verdict for the plaintiff and against Globe Laboratories, Inc., for the sum of $35,609.50 on which judgment was entered. Globe Laboratories, Inc., filed an alternative motion for either a judgment notwithstanding the verdict or for a new trial. The trial court overruled this motion and Globe Laboratories, Inc., has taken this appeal therefrom.

This being a law action we shall consider the evidence adduced according to the principle applicable in such cases and not reverse the verdict of the jury unless it is clearly wrong. The principle applicable is stated in Welstead v. Ryan Construction Co., 160 Neb. 87, 69 N. W. 2d 308, as follows: "In determining the sufficiency of evidence to sustain a verdict it must be considered most favorably to the successful party, any controverted fact resolved in his favor, and he must have the benefit of inferences reasonably deducible from it."

Appellee, Jean R. Brown, who was 46 years of age at the time of trial, is a native of Clarks, Nebraska, and lives in that town. By vocation he is a farmer and feeder with over 20 years of successful experience in buying, feeding, and marketing lambs, having fed between 400,-000 and 500,000 lambs in his lifetime and as high as 40,-000 in a single year. At all times herein material he had two feed lots near Clarks, with sheep pens, which he used in connection with his lamb feeding operations, one is referred to as the north place and the other as the home place. These two feed lots are about 3½ miles apart, the closest one to Clarks being some 2½ miles distance therefrom. The pens at these two feed lots were so constructed that the lambs in the different pens used the same tanks for watering and the partition fences were so constructed that although the sheep in the different pens could not intermingle they could touch each other, especially with their heads. A common supply of feed was used in feeding the lambs in the various pens.

Appellee always purchased high quality or reputation lambs for feeding, such lambs usually averaging between 70 and 75 pounds and were in full wool. The lambs are then fed from 75 to 90 days when they ordinarily reach top quality and are in "Full Bloom" as a well-fed and finished lamb is referred to in the trade. When finished a lamb should weigh about 100 pounds. Appellee had become entirely familiar with the eating habits of lambs. The usual procedure in feeding lambs, at the time herein material, was to give them ground hay and a little oats for 2 or 3 weeks after they were shipped in order to get them over the effects of shipping; then to vaccinate them for the purpose of immunizing them against Enterotoxemia, which disease will be hereinafter more fully described; then to wait another 10 or 12 days before putting them on full feed in order to give the bacterin used the necessary time to have its effect; and thereafter to gradually work the lambs onto a heavier diet for the purpose of fattening and

finishing. The usual heavier feeding consists of a daily ration of 2½ to 3 pounds of corn, ¼ pound of protein, and 1 pound of ground hay, which ordinarily produces an average daily gain of ⅓ pound. The purpose thereof is to get the lamb to "Full Bloom" as quickly as possible.

There are present in the soil bacteria or germs of a spore type called Clostridium Perfringens Type D and they are also usually present in the intestinal tract of sheep and lambs. Under ordinary conditions these bacteria or germs are not harmful. However, when lambs are put on a heavy diet of rich feeds, such as is done in commercial feeding and finishing, these bacteria or germs multiply very rapidly and produce a toxin which is poisonous and when sufficient thereof is absorbed into the bloodstream of the lamb from its digestive tract the result is fatal. This condition is brought about because the rich feeds neutralize the acidity of the intestines and allow them to absorb the toxin. It is called Enterotoxemia and is also referred to as pulpy kidney disease, overeating disease, and feed lot disease. To prevent this condition from developing in lambs when in a feed lot being fattened for market it was formerly necessary to give them more rough feed, thus extending the time necessary to bring them to a finished condition. In order to enable the feeder of lambs to cut down this time and not lose more than the normal amount, which is ordinarily not over 2 percent, there was developed a vaccine for the purpose of preventing this disease or immunizing lambs therefrom called Clostridium Perfringens Type D Bacterin, which we shall hereinafter refer to as bacterin. It first came on the American market in 1948, being produced and marketed by the Corn States Serum Company of Omaha, Nebraska, which company we shall hereinafter refer to as Corn States, although it apparently had been in use in Australia, New Zealand, and England prior thereto. Appellee began using this bacterin as soon as it came on the market.

In the years 1949, 1950, and 1951 appellee had suc-

cessfully vaccinated his lambs with bacterin produced by Corn States, having purchased it from Dr. Frank A. Jelen, a veterinarian from Omaha, Nebraska. He apparently purchased 24,000, 40,000 and 45,000 doses from Jelen during these years. It appears that Jelen lost his agency for Corn States products for he was no longer able to furnish that company's bacterin to appellee. However, in December 1950, Jelen became a wholesaler of the products of appellant Globe Laboratories, Inc., in Nebraska, which later included bacterin. This Jelen did through Dr. Jelen's Veterinary Supply Corporation, a Nebraska corporation, which he owned, operated, and used for that purpose.

Globe Laboratories, Inc., which will hereinafter be referred to as Globe, is a Texas corporation with its headquarters in Fort Worth, Texas. It manufactures and distributes veterinary biological and pharmaceutical products for use in connection with livestock, which products include Clostridium Perfringens Type D Bacterin. Globe started to perfect a method for producing the latter in December 1949; submitted an Outline of Procedure for the production thereof to the Bureau of Animal Industry of the United States Department of Agriculture on September 18, 1951, which the latter filed; there was then issued to Globe on the same day, by the United States Department of Agriculture, a license to produce such bacterin; and thereafter, on January 3, 1952, Globe released its first bacterin on the commercial market. Globe's license to produce was renewed for 1952 and was in full force and effect at all times herein material.

Prior to October 19, 1952, appellee had purchased some lambs near Douglas, Wyoming. On that date these lambs were delivered to him by rail at Clarks, Nebraska, appellee having purchased a total of 9,557. We shall hereinafter refer to them as the Wyoming lambs. About September 1, 1952, appellee had purchased 3,700 lambs, which we shall refer to herein as the Idaho lambs, and about December 1, 1952, he purchased 1,200 lambs, which

we shall herein refer to as the Omaha lambs. The name applied to each of these groups has its origin from the locale where they were purchased.

On September 22, 1952, Dr. Frank A. Jelen, whom we shall hereinafter refer to as Jelen, voluntarily wrote appellee and advised him he had bacterin available produced by Globe. Thereafter, on November 4, 1952, appellee met Jelen at Omaha in the Live Stock Exchange Building and made arrangements with Jelen whereby Jelen was to come to Clarks and vaccinate the Wyoming lambs with Globe bacterin. Jelen then ordered 10,000 doses of bacterin from Globe, which he received. It consisted of 1,250 doses of Serial 105, 1,250 of Serial 106, and 7,500 of Serial 109. We shall set out the significance of these serial numbers later in this opinion. On Thursday and Friday, November 6 and 7, 1952, Jelen went to Clarks and vaccinated 9,531 Wyoming lambs. Death and sickness occurred among these lambs immediately following their vaccination. That fact gave rise to this action. We shall discuss the facts relating thereto in more detail later in the opinion.

Before proceeding with a discussion of Globe's contentions relating to the merits of the case we shall deal with those it has raised relating to procedural and jurisdictional questions. Globe contends the trial court erred in overruling its motion to dismiss for the reason that the case was not brought in the name of the real party in interest as section 25-301, R. R. S. 1943, provides it shall be, except as otherwise provided by section 25-304, R. R. S. 1943. In this respect the trial court, by its instruction No. 8, advised the jury that as a matter of law appellee was the proper party plaintiff and had a right to bring the action in his own name.

The evidence adduced establishes the fact that appellee's brother Edwin F. Brown, who lives in Clarks, Nebraska, where he is a rural mail carrier, had loaned appellee money over a period of years, which was invested in the business, and had a fifty-fifty profit and loss shar-

ing interest in appellee's feeding operations, including the Wyoming lambs here involved. However, the record further establishes that all business was done in the name of appellee; that appellee borrowed the money to buy the Wyoming lambs in his own name from the Live Stock National Bank of Omaha; that appellee had the right to and did make all decisions as to when to buy and sell the lambs and how to feed and care for them; and that the only interest the brother of appellee had in appellee's feeding operations, because of the money he had invested therein, was the profit and loss sharing arrangement.

We think the situation here presented comes within the meaning of the language of section 25-304, R. R. S. 1943; that is, that appellee is a person in whose name a contract was made for the benefit of another and may therefore bring an action based thereon without joining with him such other person. But let us assume the evidence establishes a partnership. In that situation we think the following would be controlling: "While, as a general rule, all the members of a partnership must be joined as parties plaintiff in actions by partnerships, there are certain well-recognized exceptions which are not subject to such requirement. The most important of these governs the case of dormant or special partners, for it is now well established that it is not necessary that a dormant partner or a nominal partner be joined as a plaintiff, if his nonjoinder does not in any way injure the defendant. The other partners have the option of joining the dormant partners as plaintiffs with them in a suit on behalf of the partnership. Where a contract is made and the work executed by a person in his own name, the fact that he is a member of a partnership, even if the other partners share in the profits, does not make it necessary to join them as parties." 40 Am. Jur., Partnership, § 433, p. 432. See, also, 68 C. J. S., Partnership, § 208, p. 682; Dwyer v. Wiley Hotel Co., 91 Ohio App. 525, 108 N. E. 2d 859.

As stated in Dwyer v. Wiley Hotel Co., *supra:* "Conceding that Beasecker was a partner, the evidence shows that he was a dormant or silent partner. All business was transacted in the name of the plaintiff; all bills were charged to the plaintiff; the bank account was in the plaintiff's name; and the vendor's license was in her name. It is not necessary that a dormant or silent partner be joined in the action."

As we said in Archer v. Musick, on motion for rehearing, 147 Neb. 1018, 25 N. W. 2d 908, 168 A. L. R. 1164, quoting the following from State ex rel. Sorensen v. Nemaha County Bank, 124 Neb. 883, 248 N. W. 650: " 'In ascertaining whether the plaintiff is the real party in interest, the primary and fundamental test to be applied is whether the prosecution of the action will save the defendant from further harassment or vexation at the hands of other claimants to the same demand. If the defendant is not cut off from any just defense, offset, or counterclaim against the demand and a judgment in behalf of the party suing will fully protect him when discharged, then is his concern at an end.' 2 Bancroft, Code Practice and Remedies, 1094."

In view of the foregoing principles, which have application here, we find Globe's contention to be without merit.

Globe further contends the trial court erred in overruling its special appearance objecting to the court's jurisdiction over it. This is primarily based on the contention that Globe, a foreign corporation, had no agent, office, merchandise, or place of business in Nebraska and had never brought itself within a situation to which section 21-1201, R. R. S. 1943, has application. Section 21-1201, R. R. S. 1943, provides, in part, as follows: "* * * and such service of process or of any such other legal notice as aforesaid upon the Secretary of State, * * * shall constitute valid service upon such corporation in all courts of this state, in counties where the cause of action, or some part thereof, arose, or in

counties where the contract, or portion thereof, entered into by such corporation has been violated or is to be performed." Appellee caused service to be made on the Secretary of State.

Before any state can subject a foreign corporation to the jurisdiction of that state such corporation must have either expressly consented to such jurisdiction or must have done sufficient acts therein to constitute a submission to such jurisdiction. McWhorter v. Anchor Serum Co., 72 F. Supp. 437.

Even though a foreign corporation has not expressly consented to such jurisdiction but is actually doing business in this state, then a valid service of process may be made against it upon the Secretary of State. Wilken v. Moorman Manufacturing Co., 121 Neb. 1, 235 N. W. 671; Yoder v. Nu-Enamel Corp., 140 Neb. 585, 300 N. W. 840.

No all-embracing rule can be laid down as to just what constitutes the manner of doing business by a foreign corporation in order to subject it to process in any given jurisdiction. Each case must necessarily be determined by its own facts. Pitzer v. Stifel, Nicolaus & Co., 143 Neb. 394, 9 N. W. 2d 495; McWhorter v. Anchor Serum Co., *supra;* American Asphalt Roof Corp. v. Shankland, 205 Iowa 862, 219 N. W. 28, 60 A. L. R. 986; Dahl v. Collette, 202 Minn. 544, 279 N. W. 561.

As already stated, Globe is a Texas corporation engaged in the production and marketing of serums, vaccines, antitoxins, biologics, and analogous products for use in the treatment of animals with its principal place of business in Fort Worth, Texas. It handled the sale of its products in Nebraska through four wholesalers, one being located in Fremont, one in Lincoln, and two in Omaha. It sold its products direct to these wholesalers who, in turn, sold them to drug stores and other retail outlets in Nebraska. While appellant had no resident agent, office, merchandise, or place of business in Nebraska it did carry on a very active program therein to

sell its products. Richard D. Watson was, at the time, employed by Globe as a traveling salesman working on a salary and commission basis and was driving a car furnished by Globe so as to permit him to call on the trade. While he was a resident of Atlantic, Iowa, his territory included most of Nebraska. He solicited many retail outlets in Nebraska, seeking to sell them Globe products. These outlets included some 300 to 400 druggists. Watson would send all orders he received to the four wholesalers in Nebraska, which one of these wholesalers the order would be sent to would depend upon which one the buyer designated. The wholesaler would fill the order from stock it had purchased from Globe and collect therefor from the retailer. Numerous shows or exhibitions, called dealer's schools, were held at various places in Nebraska, being sponsored primarily by dealers. They were usually attended by Watson and some other officer or representative of Globe. At these shows or exhibitions, which were usually attended by dealers, farmers, and students, the latter including G. I.'s, movies were shown of animal diseases and their treatment with Globe products. Lectures were also given along the same line and Globe's advertising literature would be passed out to those present. These meetings were solely for the purpose of acquainting those present with Globe products and their use as a means to promote the sale thereof.

As stated in Cheney Brothers Co. v. Massachusetts, 246 U. S. 147, 38 S. Ct. 295, 62 L. Ed. 632: "These salesmen solicit and take orders from retail dealers and turn the same over to the nearest wholesale dealer, who fills the order and is paid by the retailer. Thus the salesman, although not in the employ of the wholesaler, is selling flour for him. Of course this is a domestic business,—inducing one local merchant to buy a particular class of goods from another, * * *." See, also, International Harvester v. Kentucky, 234 U. S. 579, 34 S. Ct. 944, 58 L. Ed. 1479.

We think appellant was doing business in this state sufficient to authorize service upon it by serving the Secretary of State as is authorized by section 21-1201, R. R. S. 1943.

While the action was pending service was personally had in Douglas County on April 13, 1953, upon C. P. Mehaffy of Fort Worth, Texas, appellant's then vice-president and sales manager, while he was voluntarily in Omaha attending a meeting of the American Animal Health Pharmaceutical Association. Mehaffy was chairman of its executive committee and presided at a meeting of that committee held on April 14, 1953.

We said in Wilken v. Moorman Manufacturing Co., *supra*: "A sales manager of a foreign corporation who exercises judgment and discretion in the conduct of the corporation's affairs within this state is, within the meaning of the statute relating to service of process on such corporations, a managing agent, notwithstanding his acts and doings as such agent may refer only to a part of the business transacted by the corporation."

And in Klopp, Bartlett & Co. v. Creston City Guarantee Water-Works Co., 34 Neb. 808, 52 N. W. 819, 33 Am. S. R. 660, we said: "Where a foreign corporation contracts a debt in this state, as for labor and materials, service in this state upon the managing agent is sufficient, although he be but temporarily within the state."

We think service on Mehaffy was within the provisions of sections 25-511 and 21-1201, R. R. S. 1943. Mehaffy, in his capacity as sales manager, had been in Nebraska on previous occasions promoting the interests of Globe. He was an agent or managing agent within the meaning of the foregoing statutory provision while in Nebraska because of the general powers that he had in regard to appellant's business here. To hold otherwise would defeat the purpose of these statutes since Globe was actually doing business in Nebraska but not maintaining a resident agent. However, we do not think Jelen was of that capacity. See, Ord

Hardware Co. v. Case Threshing Machine Co., 77 Neb. 847, 110 N. W. 551, 8 L. R. A. N. S. 770; Ritchie v. Illinois C. R. R. Co., 87 Neb. 631, 128 N. W. 35. Consequently, effective service could not be made on him as an agent or managing agent within the meaning of the foregoing statutes.

Globe further contends the cause of action did not arise in Douglas County within the meaning of section 21-1201, R. R. S. 1943, so as to authorize the district court thereof to issue and cause to be served a valid summons upon the Secretary of State for it. We have already hereinbefore set forth that part of this statute which has application to this question.

The evidence establishes that the contract entered into by Jelen and appellee on November 4, 1952, whereby appellee purchased Globe bacterin, was entered into in Douglas County. It also included the services of Jelen, who was to vaccinate the lambs. Therefore the sale of the bacterin took place in Douglas County and any cause of action arising out of any breach of warranty relating thereto arose in that county although the use of the product subsequently occurred when the lambs were vaccinated in Merrick County. There is, or course, the further fact that the action could rightfully be brought against Jelen in Douglas County as that was the county of his residence. This latter has particular application to the service had on Mehaffy because section 25-408, R. R. S. 1943, provides an action against a foreign corporation may be brought in any county where said defendant may be found. We think the service here made on either the Secretary of State or C. P. Mehaffy was good.

At the conclusion of the trial the court dismissed Jelen and Dr. Jelen's Veterinary Supply Company from the case. The trial court stated its reason for doing so as follows: "This action is taken by the Court for the reason that said defendants last named, and each of them, were originally represented in this cause by John E.

Von Dorn, Esquire, who is now deceased; that no further appearances have been made in the present case by either of said defendants, and that the evidence received in this case shows affirmatively that Dr. Frank A. Jelen is at this time suffering from an illness which his doctor says prevents him from appearing in Court to give testimony. Therefore said defendants and each of them not being represented during the trial of this case, they are both dismissed by the Court as parties defendant."

Globe contends it was prejudiced thereby and that the case should not have been submitted to the jury solely on the question of its liability. The position now taken by Globe seems to be opposite to what it took at the beginning of the trial for the record shows its counsel then made the following motion: "Now, therefore, the defendant in the interest of a fair trial moves the Court to grant unto the defendant Globe Laboratories, Inc., a separate trial so that justice may be done and the case may be determined as between the plaintiff and the Globe Laboratories, Inc., without the presence of the other defendants."

Dr. Joseph P. Drozda, Jelen's attending physician, testified Jelen had suffered a physical relapse in the form of a severe cerebral vascular stroke on December 4, 1954; that at the time of trial he was a wheelchair patient and quite excitable and emotional; and that, in his opinion, Jelen was not then in physical or mental condition which would permit him to attend the trial and appear therein as a witness. The doctor went on to testify that in his opinion it would be fatal for him to do so.

We said in Combs v. Owens Motor Co., 121 Neb. 5, 235 N. W. 682, that: "To warrant the reversal of a judgment, it must affirmatively appear from the record that the ruling with respect to which error is alleged was prejudicial to the rights of the party complaining."

We can find nothing in the record that would indicate Globe was prejudiced in any way by what the trial court did. The record indicates the case was tried solely on the question of whether or not it was liable. Under these circumstances we think this contention to be without merit.

Globe contends the trial court erred when it overruled its motion for a directed verdict made at the close of all the testimony and after both parties had rested. This contention relates itself to the question of the sufficiency of the evidence to establish: First, that there were warranties made by Globe, either express or implied, upon which appellee relied in buying the bacterin; second, if there was, whether or not it was sufficient to establish any breach thereof; and third, if it did, whether or not it was sufficient to establish such breach was the proximate cause of injury and damage to appellee's lambs.

In this respect it is true, as Globe contends, that: "In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed." Cook Livestock Co. v. Reisig, 161 Neb. 640, 74 N. W. 2d 370. But, the evidence adduced will be reviewed in the manner as hereinbefore set forth in determining these questions. See Granger v. Byrne, 160 Neb. 10, 69 N. W. 2d 293.

The primary question for our decision under this contention is whether or not appellee adduced sufficient competent evidence from which it can be said a jury could properly find that Globe made either express or implied warranties, or both, that its bacterin was reasonably satisfactory for use in immunizing sheep from the disease of Enterotoxemia; that its use would not be injurious to them; that appellee did rely thereon

in making his purchase thereof; that a breach thereof occurred; and that injury and damages were caused to appellee's lambs by reason thereof. See Long v. Carpenter, 154 Neb. 862, 50 N. W. 2d 67.

What is a warranty? In Wat Henry Pontiac Co. v. Bradley, 202 Okl. 82, 210 P. 2d 348, that court defined it as follows: "Warranty is a matter of intention. A decisive test is whether the vendor assumes to assert a fact of which the buyer is ignorant, or merely states an opinion, or his judgment, upon a matter of which vendor has no special knowledge, and on which the buyer may also be expected to have an opinion and to exercise his judgment. In the former case there is a warranty; in the latter there is not."

Section 69-412, R. R. S. 1943, being part of the Uniform Sales Act, defines express warranty as: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon." It then goes on to provide that: "No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only, shall be construed as a warranty."

Section 69-415, R. R. S. 1943, being part of the same act, provides: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. * * * (6) An express warranty or condition does not nega-

tive a warranty or condition implied under this act unless inconsistent therewith."

We said in Ralston Purina Co. v. Iiams, 143 Neb. 588, 10 N. W. 2d 452, that: "In order for an express warranty to exist, there must be something positive and unequivocal concerning the thing sold, which the vendee relies upon, and which is understood by the parties, as an absolute assertion concerning the thing sold, and not the mere expression of an opinion; * * *." See, also, Garbark v. Newman, 155 Neb. 188, 51 N. W. 2d 315; Donelson v. Fairmont Foods Co. (Tex. Civ. App.), 252 S. W. 2d 796; Miller v. Economy Hog & Cattle Powder Co., 228 Iowa 626, 293 N. W. 4. As stated in Donelson v. Fairmont Foods Co., *supra:* "It is said that an express warranty is 'an affirmation of fact or a promise by seller, relating to goods, which has a natural tendency to induce the buyer to purchase and upon which he relies in purchasing the goods * * *.'"

On the other hand in Ralston Purina Co. v. Iiams, *supra,* we said: "* * * representations which merely express the vendor's opinion, belief, judgment, or estimate do not constitute a warranty. Dealer's talk is permissible; and puffing, or praise of the goods by the seller, is no warranty, such representations falling within the maxim simplex commendatio non obligat." See, also, Cook Livestock Co. v. Reisig, *supra;* Ross v. Porteous, Mitchell & Braun Co., 136 Me. 118, 3 A. 2d 650; Shawen v. District Motor Co. (D. C.), 34 A. 2d 29.

As stated in Saunders v. Cowl, 201 Minn. 574, 277 N. W. 12: "It is not easy to draw the line accurately between affirmations of fact and statements of opinion."

Jelen had lost the representation of Corn States and could no longer supply appellee with its bacterin, as he had in the past. In December 1950 Jelen had taken on the full line of Globe products which, after January 3, 1952, included bacterin. At a conference with President Frank Jones of Globe at Denver, Colorado, in September 1952, Jones stated to Jelen in effect that they

would not put any bacterin on the market until they had the best; that Globe's bacterin was testing as good or better than Corn States; and that Globe's bacterin was as good as any on the market. As a result of this conference, and based on what Jones had told him, Jelen wrote appellee a letter dated September 22, 1952, advising appellee he had not been able to make a deal with Corn States for bacterin but therein did advise him he thought Globe's new product, which he could supply, was "as good as any obtainable." Standing alone we think this language comes within our holdings in Ralston Purina Co. v. Iiams, *supra,* and Cook Livestock Co. v. Reisig, *supra,* and does not amount to a warranty.

However, included in this letter was a circular put out by Globe and sent to Jelen for distribution. It contained the following language: "Clostridium Perfringens Type D Bacterin is recommended for immunizing sheep and lambs against Enterotoxemia. * * * TIME FOR IMMUNITY TO DEVELOP: *Under average conditions, a protective degree of immunity is established in 10 to 12 days following vaccination.* * * * DURATION OF IMMUNITY: The exact duration of immunity is not known. Field observations indicate that immunity persists for several months." (Emphasis ours.) We think the language here set forth, particularly that part emphasized, constitutes an express warranty within the meaning and intent of our statute and the opinions hereinbefore cited. It is a positive statement as to what the product would do, which was undoubtedly intended to and would naturally have a tendency to induce a buyer to purchase it and to rely thereon in doing so. In fact that is exactly what appellee contends he did after reading the circular. He testified he read and relied on the information contained in this circular in buying and using Globe's bacterin to vaccinate his lambs as he believed, from what he read, it

would be suitable to immunize them against the disease resulting from overeating.

The language quoted from the circular above referred to and sent to appellee states that "Field observations indicate that immunity persists for several months." The record discloses Globe never did make any field tests of its bacterin nor did they bring in any feeders who had used it and found it to be satisfactory, although it is apparent Globe had sold it to others beside Jelen and that their records would disclose who had purchased it. In this situation we thing the following principle has application: "In the trial of a civil action, after the plaintiff has introduced evidence tending to prove his case, if the defendant fails to testify to matters peculiarly within his knowledge necessary to his defense, a presumption exists that his testimony, if produced, would militate against his interest, which presumption may be considered by the court or jury trying the case in determining the facts proved." Talich v. Marvel, 115 Neb. 255, 212 N. W. 540. See, also, Medelman v. Stanton-Pilger Drainage Dist., 155 Neb. 518, 52 N. W. 2d 328; Alexander v. Turner, 139 Neb. 364, 297 N. W. 589.

We think there is a further reason why there was an implied warranty that the bacterin would be reasonably fit for the purpose it was intended to be used for and free from any substance that would be injurious to lambs. Appellee knew nothing about bacterin itself but had satisfactorily vaccinated some 80,000 to 90,000 head of lambs with Corn States bacterin, which he had purchased from Jelen. Jelen knew this but had lost his ability to get bacterin from Corn States but was very desirous of keeping appellee's business, since it was substantial. In view thereof Jelen contacted Dr. Frank Jones, president of Globe, and discussed this situation with him. At that conference, which was held in Denver, Colorado, about the 12th or 13th of September, 1952, Jones told Jelen what we have

hereinbefore set forth. Jelen believed Jones and informed appellee, prior to the agreement of November 4, 1952, being entered into, of what Jones had told him. It was one of the factors that induced appellee to use Globe's bacterin and not to insist on that of Corn States, which he had found satisfactory. We think this factual situation comes within subsection (1) of section 69-415, R. R. S. 1943, and resulted in an implied warranty on the part of Globe that the bacterin would be reasonably fit for the purpose of immunizing sheep. See, Ross v. Porteous, Mitchell & Braun Co., *supra;* Shawen v. District Motor Co., *supra*; Saunders v. Cowl, *supra;* Marxen v. Meredith, 246 Iowa 1173, 69 N. W. 2d 399; Donelson v. Fairmont Foods Co., *supra;* Miller v. Economy Hog & Cattle Powder Co., *supra;* Giant Mfg. Co. v. Yates-American Mach. Co., 111 F. 2d 360; Ralston Purina Co. v. Novak, 111 F. 2d 631; Davenport Ladder Co. v. Edward Hines Lumber Co., 43 F. 2d 63; Barrett Co. v. Panther Rubber Mfg. Co., 24 F. 2d 329. As stated in Ralston Purina Co. v. Novak, *supra:* "The Uniform Sales Act adopted by Nebraska provides in effect that where the buyer makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill and judgment, there is an implied warranty that the goods shall be reasonably fit for such purposes. * * * The fact that the article had a trade name does not necessarily negative the existence of an implied warranty for fitness for a particular purpose when it is purchased not by name but for a particular purpose * * *." The situation here comes within this language.

In view of the foregoing we have come to the conclusion that the jury could have properly found that there was both an express and implied warranty that the bacterin would, under average conditions, establish a protective degree of immunity from Enterotoxemia; and that it was reasonably fit for such pur-

pose and would not be injurious to lambs that were vaccinated with it.

We come then to the question of the sufficiency of the evidence adduced to present a jury question as it relates to the issue of whether or not these warranties were breached and, if so, whether or not such breach was the causation of injury to appellee's lambs and resulting damage thereto.

The appellee adduced evidence to the following effect: That when the Wyoming lambs arrived at Clarks, Nebraska, on the morning of October 19, 1952, and unloaded, they were in excellent condition, only one having died enroute; that 9,556 lambs were unloaded; that the lambs were trucked to the two sheep feeding lots of appellee near that town, about 5,000 being taken to the north place and about 4,500 being taken to the home place; that at each of these two feed lots the lambs were separated and placed in pens according to their size, being divided into two pens at each place; that at the north place 2,000 were put in one pen and 3,000 in another while at the home place 1,000 were put in one pen and 3,500 in another, the smaller number at each place being the lighter lambs; that at the north place there was at that time a pen containing 2,000 Idaho lambs and at the home place there was at that time a pen containing 1,700 Idaho lambs; and that all the Wyoming lambs were immediately placed on the usual rations of ground hay with a small amount of oats and kept on that ration until vaccinated by Jelen on Thursday and Friday, November 6 and 7, 1952.

The appellee adduced evidence to show that on these 2 days Jelen vaccinated 9,531 lambs, as about 25 had died from natural causes since their arrival at Clarks on October 19, 1952; that the lambs were then in good condition; that they were vaccinated in order to immunize them from Enterotoxemia when put on heavy feed for finishing; and that Jelen used Globe's bac--

terin for this purpose, using 7,500 doses of Serial 109 and the balance of Serials 105 and 106.

As is often the case when lambs are vaccinated the evidence adduced shows many of the lambs vaccinated had a marked stiffness the day following their vaccination. However, this condition did not disappear, as it usually does. The evidence shows that this condition, which was present in about two-thirds of the lambs, grew worse and the lambs lost their appetite, eating only about half their usual rations; that they became gaunt looking, appeared droopy, draggy, listless, and dull; that they had dirty faces; that their wool lost its life; and that they started lying around jerking their heads back. The foregoing are not the usual symptoms of Enterotoxemia. As already stated, these conditions kept getting worse until finally, about a week after the lambs had been vaccinated, they started dying. There is evidence to the effect that they continued dying over a period of 2 or 3 weeks, the death rate reaching as high as 70 to 80 a day. This same condition existed in all four pens of Wyoming lambs which were at both feed lots; whereas, the Idaho lambs in the adjoining pens were not affected in any way. The Idaho lambs had been vaccinated with Corn States bacterin in the latter part of September.

The evidence also shows that appellee did not call a veterinarian in order to find out just what it was that was causing these lambs to die during the time they were in the condition herein described immediately following their vaccination. Consequently there is no medical testimony directly on the point of just what it was that caused these conditions to develop.

After the above conditions had somewhat subsided appellee put the heavier lambs on heavier rations in order to prepare them for market. Shortly after he did so some of them became sick and died. The condition of the sick lambs was described by appellee as follows: They were weak and wobbling around, some had fallen

down, some were grinding their teeth, and some were frothing at the mouth and throwing their heads back in a kind of stiffened condition. He testified there were many lambs on feed that had these symptoms. However, when appellee stopped feeding these lambs the heavier diet they would usually quit dying within 24 hours. Finally appellee called Drs. Farmer and Boice, veterinarians located in Central City, Nebraska. They came out to one of appellee's feed lots on December 24, 1952. There they examined the pen of Wyoming lambs that were being given the heavier rations. Some of the lambs were sick and others were dead. Dr. Boice testified that on December 24, 1952, he posted 4 dead lambs taken from this lot on that day and found they had died of Enterotoxemia. Subsequent thereto, between December 26 and 30, 1952, Drs. Farmer and Boice, on three different occasions, examined other dead lambs taken from pens of Wyoming lambs that were being given heavier feed and that an autopsy of their carcasses showed they had died of the same condition. Dr. Jelen was called and he stopped at one of appellee's feed lots on December 26, 1952. He took the carcasses of two dead Wyoming lambs with him to Omaha. He testified they had died of Enterotoxemia. He also testified he took these two carcasses over to Corn States and that Drs. Gessellchen and Baldwin of that company told him there was no question as to the cause of their deaths, it was Enterotoxemia. Jelen testified that when a lamb gets Enterotoxemia it becomes stiff, staggers, and falls on its side. Appellee testified that he lost between 700 and 800 lambs from these conditions. The deaths all occurred among the heavier lambs which had been placed on heavier rations.

Appellee had about 3,000 lighter Wyoming lambs in two pens, one pen being at each feed lot. These were not put on heavier feed until they had been revaccinated. After the initial trouble from the vaccination of November 6 and 7, 1952, had subsided there was no more trouble

among these lighter lambs. Likewise there was no trouble with the Idaho lambs in adjoining pens nor with 1,200 Omaha lambs which had been placed in a pen at the home place when they arrived about December 1, 1952. It should be said here that both the Idaho and Omaha lambs were fed out and marketed in good condition and in the normal feeding time without any trouble such as was experienced with the Wyoming lambs, although they were at all times in adjoining pens. They were, however, vaccinated with either Corn States or Fort Dodge bacterin and not Globe's.

Drs. Farmer and Boice recommended that the lambs be revaccinated, which was done commencing December 30, 1952, with Corn States and Fort Dodge bacterin. No further trouble was had thereafter in feeding out the remaining lambs. They were marketed between February 3 and May 13, 1953, a total of 7,393 being sent to market.

Appellee offered no direct proof to the effect that the bacterin used contained some substance that would be injurious to lambs when vaccinated therewith nor did he offer any direct proof that the bacterin lacked sufficient potency to immunize lambs against Enterotoxemia when vaccinated therewith except the facts as to what actually happened to his Wyoming lambs when Globe bacterin was used to vaccinate them and what happened to his Omaha and Idaho lambs in adjoining pens during the same period of time after they had been vaccinated with either Corn States or Fort Dodge bacterin.

On the other hand Globe offered proof of tests made by experts to show that its product was sterile, pure, and sufficiently potent to accomplish the purpose for which it was produced and that it contained nothing that would be injurious to lambs when used to vaccinate them against Enterotoxemia. We shall not set forth all the details of its production, which is fully covered in the record, but will set forth generally what the evidence adduced shows in that regard.

The production of this bacterin is under the authority

of and subject to regulation by the United States Department of Agriculture which, through its Bureau of Animal Industry, has promulgated and issued regulations covering that subject. Pursuant to the requirements thereof Globe, on September 18, 1951, filed an Outline of Procedure for its production of this bacterin with the Bureau of Animal Industry, attaching thereto a full statement of production procedures followed and the results of tests, et cetera, which it had made in establishing the ground work of its procedures set out therein. After this outline had been filed Globe was issued a license by the Department of Agriculture authorizing it to produce the bacterin.

Globe had begun experimental work in this field in December 1949. The preliminary experimental work and final drafting of the Outline of Procedure for production was primarily carried out by Dr. Henry D. Carpenter, a bacteriologist and Globe's laboratory director, who was assisted by Carl D. Heather, a bacteriologist employed by Globe.

When a batch of bacterin is produced it is given a serial number such as 105, 106, and 109 so its history may be known and its use properly regulated, for after it is released and put on the market it can only be used for 2 years as its potency has a tendency to deteriorate. Globe produced the history of Serial 105, Serial 106, and Serial 109 in great detail showing that all of the numerous tests relating thereto, and made by it, were satisfactory. These included toxin level tests, detoxification tests, sterility tests, purity tests, combining power unit or potency tests, and animal safety tests. This bacterin was a new product for Globe and while the men in charge of producing it testified that all of the tests were ultimately satisfactory it is evident that they were having some trouble keeping the culture media free of contamination and of causing it to become sterile by the use of formaldehyde. In fact a substantial portion of the culture media developed in the batches comprising Serials 105 and 106 had to be

discarded. The same conditions developed in several containers of culture media used in connection with producing Serial 109. However, the contents of these containers were not discarded because when they were subsequently retested it was found by those in charge they were satisfactory. The contents thereof were subsequently used and marketed, being the bulk of the bacterin used by Jelen in vaccinating appellee's lambs.

Subsequent to the difficulty encountered by the use of its product on appellee's Wyoming lambs Globe caused several tests of Serials 105, 106, and 109 to be made. It should here be stated that government regulations required, and Globe kept, samples of all bacterin produced, including Serials 105, 106, and 109, under refrigeration at its place of business in Fort Worth. In early February 1953, Carpenter and Heather of Globe conducted a test on 12 lambs by vaccinating 4 of them with 5 ccs. of the bacterin of each of Serials 105, 106, and 109, that being the amount recommended for a field dosage. They observed the reaction of these lambs for 4 weeks, but did not put them on a heavy diet of feed. It was a test to determine the reaction of the vaccination on the lambs. They found such reactions to be normal. No record of this test was kept by Globe and these men testified from their memory as to what was done and the results thereof.

On September 15, 1953, Dr. Richard D. Shuman, a veterinarian with the Pathological Division of the Bureau of Animal Industry, at the request of Globe's then counsel, tested samples of Serials 105, 106, and 109 for contamination and toxicity. The samples used had been obtained from samples in the refrigerated storage room of Globe in Fort Worth, Texas, by Dr. D. L. Berry, a veterinarian and employee of the Bureau of Animal Industry, who was stationed there. The results of the tests he made show these samples of Serials 105, 106, and 109 to be nontoxic and that they contained no bacterial contaminants that would be injurious to lambs.

Dr. Earl M. Baldwin, a bacteriologist and a doctor of veterinary medicine who was formerly with Corn States and its Director of Laboratories and the original producer of this bacterin in this country for commercial use, made a test in June 1951 of some bacterin, Lot 3, produced by Globe. He testified he did so at the request of Globe and found the potency thereof to be satisfactory. Later, after this litigation had started, Baldwin was asked to and did make another test for Globe. This time he tested samples of Serials 105, 106, and 109 sent to him by Globe. He conducted these tests on feeder lambs bought on the market but tested so he knew they had not previously been subjected to Enterotoxemia or vaccinated therefor. Using the standard dosage of bacterin he vaccinated 4 lambs with Serial 105, 4 with Serial 106, 4 with Serial 109, and 5 with Corn States bacterin, the latter in order to obtain a standard for comparison purposes. The test covered a period from December 16, 1953, to February 3, 1954. Baldwin observed these lambs daily and at no time did he observe any undesirable reaction from the vaccination in the lambs, in other words, he considered each serial was safe for use on lambs. Twenty-one days after the lambs had been vaccinated he took a blood test to compare the immunity that had been developed in the lambs by the different bacterins. This was done by determining the number of units of antitoxin or neutralizing substance that had developed in each lamb vaccinated. In the 5 lambs vaccinated with Corn States it was 4-8-8-2-8 or an average of 6 units of antitoxin per lamb; in the 4 lambs vaccinated with Serial 105 it was 8-8-1-4 or an average of 5.25 units of antitoxin per lamb; in the 4 lambs vaccinated with Serial 106 it was 8-8-1-8 or an average of 6.25 units of antitoxin per lamb; and in the 4 lambs vaccinated with Serial 109 it was 8-½-2-0 or an average of 2.6 plus units of antitoxin per lamb. Baldwin testified that bacterin should develop a potency in the average lamb of between 4 and 8 units of antitoxin although naturally all lambs will not react

the same for various reasons. However he testified the potency of the bacterin should be strong enough to do the job. He went on to testify that one-half unit of antitoxin will protect a lamb. When asked specifically about the result of Serial 109 he said the average thereof of 2.6 units was adequate although it is apparent one of the 4 lambs had built up no neutralizing substance or antitoxin from the vaccination. We shall discuss this further in dealing with instruction No. 12 given by the court.

We have not set out in full detail all of the evidence adduced by either side but from what we have set forth it is evident on what basis each party seeks to maintain his or its position. That such a defense as was here sought to be made by Globe is proper, see Shimerda v. Nebraska Serum Co., 102 Neb. 812, 169 N. W. 785. However it is Globe's thought that since it was required to and did fully meet and comply with all government regulations dealing with the production of bacterin as promulgated by the Bureau of Animal Industry by filing its Outline of Procedure for the production thereof with the Bureau of Animal Industry of the United States Department of Agriculture, by obtaining a license from the United States Department of Agriculture for its production, and by satisfactorily meeting all of its and the government's requirements relating thereto such as safety, purity, sterility, potency, et cetera, including tests made to determine those factors after appellee had had his troubles, that it was entitled to a directed verdict by the trial court and is now entitled to a judgment notwithstanding the verdict by this court in view of the fact that appellee did not offer any direct evidence that the Globe bacterin he used lacked potency, purity, and sterility and that such lack thereof was the cause of the injury and damage to his lambs. There are cases so holding, especially anti-hog-cholera cases, both as they relate to a breach of warranty or negligence and as to causation of injury and damages arising therefrom.

See, Hollingsworth v. Midwest Serum Co., 183 Iowa 280, 162 N. W. 620; Howard v. United Serum Co., 202 Iowa 822, 211 N. W. 419; Murphy v. Sioux Falls Serum Co., 47 S. D. 44, 195 N. W. 835; Eagle Biological & Supply Co. v. Breed, 90 Okl. 7, 215 P. 424; Richards v. H. K. Mulford Co., 236 F. 677; Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 219 N. W. 40; Brown v. H. K. Mulford Co., 198 Mo. App. 586, 199 S. W. 582. As stated in Richards v. H. K. Mulford Co., *supra*: "Upon either the theory of negligence or of breach of warranty, plaintiff's first step is to establish that the vaccine was infected when he bought it, and if he fails in that step, it becomes immaterial whether there is an implied warranty of fitness in the sale of such an article as this."

On the other hand the appellee relies on cases in some of which, although all government regulations and requirements had been satisfactorily met in connection with the production and marketing of the product used, the court was nevertheless of the opinion that it was a jury question when the circumstances in connection therewith established that sickness and death immediately followed the use of the product. See, American Cyanamid Co. v. Fields, 204 F. 2d 151; Haberer v. Moorman Mfg. Co., 341 Ill. App. 521, 94 N. E. 2d 611; Park v. Moorman Mfg. Co., 121 Utah 339, 241 P. 2d 914, 40 A. L. R. 2d 273; Marxen v. Meredith, *supra;* Miller v. Economy Hog & Cattle Powder Co., *supra;* Ziegler v. Denver Hog Serum Co., 204 Minn. 156, 283 N. W. 134; Johnson v. Kanavos, 296 Mass. 373, 6 N. E. 2d 434; Peckham v. Eastern States Farmers' Exchange, 134 F. Supp. 950. As stated in American Cyanamid Co. v. Fields, *supra:* "* * * the jury were not bound by defendant's evidence, nor forced to accept the testimony of its experts. Here, the conflict of evidence presented a question of fact, the resolution of which was properly left to the jury, * * *."

It was of course not necessary that Globe have any guilty knowledge that its product would not do what it had advertised it would do. Yoder v. Nu-Enamel Corp.,

*supra.* But Globe was answerable for the natural consequences of its product when properly used for the purpose for which it was warranted. Colvin v. Powell & Co., 163 Neb. 112, 77 N. W. 2d 900. Under the circumstantial evidence rule all the law requires of the appellee in order to prove a breach of warranty and that injury and damage resulted therefrom is that the facts and circumstances adduced relating thereto, together with the inferences that may be legitimately drawn therefrom, shall indicate with reasonable certainty the breach of warranty complained of and that he was injured and damaged by reason thereof. See, Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112; Taylor v. J. M. McDonald Co., 156 Neb. 437, 56 N. W. 2d 610.

In view of these principles, and the facts set out to which they apply, we think the evidence adduced presented a jury question both as to whether or not the warranties made by Globe had been breached and, if so, whether or not such breach was the proximate cause of the injury and damage to appellee's lambs. As stated in Reid v. Ehr, 43 N. D. 109, 174 N. W. 71, 6 A. L. R. 586: "The physical facts speak louder than the testimony of the experts. The plaintiff was injured. This cannot successfully be disputed. She was injured by an electric current from the lamp in question. In the face of these physical facts the testimony of the experts becomes of little probative force. The jury must have disbelieved the testimony of the experts, and this they did have a right to do. Jurors, as a rule, are men of average and reasonable minds, and in the face of physical facts expert testimony did not have any great weight with them."

Globe contends, in this respect, that where scientists or experts employed by it, the United States, and others all testified as to the results of tests and examinations made by them of the defendant's product as to purity, sterility, safety, and potency, all of which were satisfactory, and where there is no dispute as to this testi-

mony and where there is no conflict therein that the court should not have instructed the jury as it did by its instruction No. 12. This instruction is as follows: "Certain witnesses have been called who testified as expert witnesses. You are not required to take the opinions of experts as binding upon you, but they are to be used to aid you in coming to a proper conclusion. Their testimony is received as that of persons who are learned by reason of special investigation and study along lines not of general knowledge, and the conclusion of such persons may be of value. You may adopt, or not, their conclusions, according to your own best judgment, giving in each instance such weight as you think should be given under all the facts and circumstances of the case."

We have often approved the rule cited from 20 Am. Jur., Evidence, § 1208, p. 1060, and quoted in Trask v. Klein, 150 Neb. 316, 34 N. W. 2d 396, which is to the following effect: "Expert opinions are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are generally regarded as purely advisory in character; the jury may place whatever weight they choose upon such testimony and may reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable." See, also, Penhansky v. Drake Realty Construction Co., 109 Neb. 120, 190 N. W. 265; McNaught v. New York Life Ins. Co., 145 Neb. 694, 18 N. W. 2d 56; Langdon v. Loup River Public Power Dist., 144 Neb. 325, 13 N. W. 2d 168; McNaught v. New York Life Ins. Co., on motion for rehearing, 143 Neb. 220, 12 N. W. 2d 108; Medelman v. Stanton-Pilger Drainage Dist., *supra.*

As stated in Penhansky v. Drake Realty Construction Co., *supra,* where a comparable instruction was approved: "It was entirely proper that the jury should consider the interest of the expert witnesses in the result of the suit, their relationship to the parties, their apparent fairness, or bias, if any of these conditions had been shown, and all the other evidence, facts and cir-

cumstances proved tending to corroborate or contradict such witnesses. Experts are as much subject to these human imperfections as other witnesses. * * * This instruction given is merely informative and cautionary. It explains to the jury for what reason the conclusions or opinions of experts are received, and points out the distinction between the testimony of such witnesses and other witnesses whose testimony is received only as to facts, and not as to opinions or conclusions."

Let us point out an example of what we mean. Dr. Baldwin made a test of Serials 105, 106, and 109 for Globe commencing December 16, 1953, and extending to February 3, 1954. We have already referred to this test and his testimony that a majority of lambs will usually develop between 4 and 8 units of antitoxin if a sufficiently potent bacterin is used but that an occasional lamb will, for some unexplained reason, develop as low as ½ to 1 unit thereof. He also stated that if the bacterin used is not potent enough it just won't do the job. Yet, when he deals with the results of Serial 109, in which one lamb developed one-half unit and another none, he says such results establish it as a satisfactory bacterin because one-half unit will protect. Dr. Baldwin's testimony in this regard would tax the credulity of any juror and certainly is not such evidence as any juror is bound to have to accept as conclusive merely because it is given by an expert. It is the type of evidence to which the instruction given has particular application.

We said in Long v. Carpenter, *supra*, that: "Section 69-469, R. R. S. 1943, provides in part: '(6) The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.'"

The jury brought in a verdict of $35,609.50 consisting of $33,593 for the death of lambs; $1,265 for damages from extended feeding time; and $751.50 for damages for revaccination of lambs that had not died. There is evidence to the effect that appellee lost 2,138 lambs

between the time the lambs were originally vaccinated on November 6 and 7, 1952, and the last thereof were marketed on May 13, 1953; that a normal loss would not have been over 2 percent or 192; and that the fair market value of these lambs was $20 each. There is also evidence to the effect that the normal feeding time for all the lambs marketed was extended for more than 30 days because of the condition they developed after the use of the bacterin and that the cost of feeding a lamb was about $2.50 a month. There was also evidence adduced that it cost the appellee in excess of the amount allowed by the jury to have the balance of these lambs revaccinated. We find the evidence fully supports the jury's verdict.

Contentions are also raised by Globe that the trial court erred in refusing to give numerous instructions requested by it and erred in giving some on its own accord. It will not be necessary to separately answer the contentions made in regard thereto as they are fully answered by what we have stated herein.

The record indicates the trial was fairly conducted and the action properly submitted to the jury. We can see no reason for interfering with its verdict and, in view of what we have herein said, have come to the conclusion that an affirmance thereof should be made by this court. The verdict of the jury and the judgment of the trial court entered thereon are affirmed.

AFFIRMED.