Roy CARTER, Plaintiff,

v.

AMERICAN BUS LINES, INC., a corporation, Defendant and Third-Party Plaintiff,
and
Hardy Furniture Company, a corporation, Defendant,
The Flxible Company, a corporation, Third-Party Defendant.

Civ. No. 133–L.

United States District Court
D. Nebraska.

Jan. 23, 1959.

See also 22 F.R.D. 323.

C. E. Sanden and F. B. Morrison (of Doyle, Morrison & Doyle) Lincoln, Neb., for plaintiff.

Robert A. Barlow (of Healey, Davies, Wilson & Barlow), Lincoln, Neb., for defendant and third-party plaintiff.

H. B. Evnen (of Baylor, Evnen & Baylor), Lincoln, Neb., for defendant.

Lawrence J. Tierney (of Cassem, Tierney, Adam, Kennedy & Henatsch), Omaha, Neb., for third-party defendant.

VAN PELT, District Judge.

The plaintiff, Carter, has alleged that on December 27, 1956 a bus owned and operated by the defendant, American Bus Lines, Inc., negligently crossed over into plaintiff's lane of traffic and collided with plaintiff head-on, injuring the plaintiff.

American Bus Lines, Inc. removed the case to this Court and thereafter impleaded the third-party defendant, The Flxible Company, which had manufactured the bus. Service of process was made on the Secretary of State, State of Nebraska, as agent for Flxible.

This motion is before the Court to dismiss as to the third-party defendant for the reason:

"That the third-party defendant is a corporation organized in the State of Ohio and is not subject to service of process within the District of Nebraska, and it is not doing business in the State of Nebraska, and has no representative in the State of Nebraska."

First, the extent of the third-party defendant's business activities in the State and District (the boundaries are co-terminous) will be stated, as drawn from the affidavits presented for the Court's consideration.

The third-party defendant has offered the affidavits of R. D. Mayer, the Secretary-Treasurer of The Flxible Company, Inc., and of Carlton McKinney, Regional Manager for Flxible Company with offices in Minneapolis, Minnesota. Mr. McKinney says that he never has had or maintained an office or employed any persons in the State of Nebraska, and that he does not have and has never had authority to bind The Flxible Company in Nebraska. He states that he never made any contracts in the State of Nebraska. He states that he contacts possible purchasers of buses but that he does not take orders or enter into any obligation in the State.

Mr. Mayer, in his affidavit, states that The Flxible Company is primarily engaged in the business of manufacturing and selling buses. He lists the following to show that Flxible is not doing business in Nebraska: No Nebraska telephone listing; no office or place of business in Nebraska; no representatives or agents located in Nebraska; no meetings of any kind in Nebraska; no independent course of advertising in Nebraska; no independent course of creating good will in Nebraska; no independent solicitation of business in Nebraska; no sales manager or managing agent, or any employees possessed with power of exercising discretion or judgment on the part of The Flxible Company maintained in the State of Nebraska; no bank account in Nebraska; no real, personal or mixed property owned in Nebraska; makes no collections, buys and sells no products in the State; does not have a distributor in Nebraska, and does not incur obligations to the citizens of Nebraska; there is not and has not been maintained in the State of Nebraska, any person, firm, or corporation performing business functions on behalf of The Flxible Company, in a regular or continuous position involving the exercise of discretion or judgment in the conduct of the regular business for which The Flxible Company was created.

Mayer does state that there has been an isolated occasion when an employee appeared in Lincoln, Nebraska, to assist the Trustees in applying to the Federal Court to purchase buses (American Bus-

lines, Inc., then being in the process of reorganization under the Bankruptcy laws). He claims this was a mere accommodation for the Trustees. Mayer also states that on isolated occasions certain servicemen in an advisory capacity assisted employees of the Bus Company regarding maintenance and repair of buses which American had purchased from Flxible outside the State of Nebraska. Flxible does not maintain service employees in Nebraska, nor a storehouse of parts. It sends employees into Nebraska only to help a Nebraska citizen who by reason of owning a bus needs the advice and help of such servicemen. Finally, it is stated that no supervisor or any employee is maintained in Nebraska to stimulate or promote sales, nor are any servicemen under the direction of any supervisor maintained in the state, nor is there anyone in the business of The Flxible Company who works regularly and continuously for said company in the State of Nebraska.

The third-party plaintiff has submitted affidavits from the following: William F. Aikman, now President of American Buslines, Inc. and at the time of the accident, the Operating Trustee of same; A. B. Schliep, Manager of Purchases of American Buslines, Inc.; Herbert E. Roberts, General Manager for the Eastern Lines of American Buslines, Inc. and J. C. Smith, the Manager of Service for American Buslines, Inc. Mr. Aikman is located in Lincoln, Nebraska, and the other affiants are located in Omaha.

Without going through each affidavit in detail, the following facts appear from these affidavits: In the fall of 1954, American began negotiations for the purchase of new buses. The negotiations were initially conducted in Dallas, Texas. The extent of such negotiations is unclear, but a letter of December 23, 1954, attached to Mr. Aikman's affidavit reveals that an order, subject to approval of the Federal Court, was sent by letter from Lincoln, Nebraska, to the offices of The Flxible Company, at Loudonville, Ohio. The affidavit reveals that a Mr. Gettrust, a Sales Manager of The Flxible

Company came to Lincoln and intended to testify before the Court as to whether General Motors or Flxible buses should be purchased, if General Motors raised the issue. This issue was not raised, so no such testimony was taken. This rather negates the conclusion of Mr. Mayer that this appearance was merely to accommodate the Trustees.

The letter of December 23, 1954 was an order for ten buses. The hearing on the application was January 31, 1955. Sometime before the hearing two things occurred: Mr. Gettrust appeared and it was decided that fifteen rather than ten buses would be purchased from Flxible, subject to Court approval. Whether the conclusion to buy more buses was reached solely in Lincoln, or elsewhere, or through the urging of Mr. Gettrust in Lincoln or elsewhere, is not apparent.

The evidence does not show whether American owned any Flxible buses prior to the 1955 purchases. It appears, however, that representatives of Flxible called on Mr. Aikman "from time to time" at his office in Lincoln during 1954. It is stated by Mr. Aikman that Mr. McKinney called on him during 1955 "on, perhaps, three or four occasions at periodical intervals, and at the time of his visits would inquire how the buses which had been purchased were operating, and whether any service problems had arisen, and generally inquired as to whether the Trustees were interested in, and were going to purchase any more buses from The Flxible Company." It is stated that McKinney indicated he would pass on any complaint to the manufacturer. It also appears that McKinney continued to call on Aikman "on at least four or five occasions during the year 1956 and called on affiant on one or two occasions during the first half of 1957." It is stated that: "Mr. McKinney apparently was interested in both sales and service."

Sixteen new buses were purchased by American from Flxible in 1956. Six of these buses were delivered to American garages in Omaha during May of 1956.

Shortly after the receipt of the first of these vehicles, a Mr. R. V. Shenberger, service representative of Flxible, called on Mr. Smith, the Manager of Service at Omaha, and discussed maintenance and service problems regarding the Flxible buses. After he left, a representative of Flxible and a representative of the manufacturer of the motor used in Flxible buses came to Omaha and conducted a one-day service school for American's mechanics at its garage in Omaha, giving instruction, showing slides, etc. After mentioning this school, Mr. Roberts states: "Thereafter, a service representative of The Flxible Company would call from time to time at the office and garage of American Buslines in Omaha."

Apparently during the summer and fall of 1956, the 1956 Flxible buses developed air-conditioning troubles. Mr. Shenberger came to Omaha two or three times during this period, at which times he assisted with the air-conditioning systems; spent a half-day with Mr. Schliep correcting his service manual and parts manual, and inquired of Mr. Smith as to whether he was encountering certain service difficulties which other operators had encountered, and offered suggestions as to how others had met these problems.

During October of 1956, two of the 1955 model Flxible buses were assigned to Omaha. One of these was the bus involved in the accident in the main case. Apparently these two buses had defective shifting rod assemblies, and a service representative of Flxible spent about the first ten days of November, 1956 in Omaha changing this assembly. Whatever labor was done on this job by American Busline employees was billed to Flxible, and the parts were furnished by Flxible. This billing of Flxible for labor by American employees, and the furnishing of parts by Flxible without cost was also true with regard to the air-conditioning work mentioned above. In this connection, it is stated by Mr. Aikman:

"During the years 1956 and 1955 when parts or service covered by the *warranty* of The Flxible Com-

pany was the reason for repair work done by the American Buslines, American Buslines billed The Flxible Company for parts and labor and The Flxible Company in turn issued Credit Memorandums in favor of American Buslines. This procedure was in addition to *warranty work* done by personnel of The Flxible Company as indicated above." (Emphasis supplied.)

The average price for each of the thirty-one buses which American purchased from Flxible was approximately $27,000. As to parts, Mr. Schliep states: "During the past three years the average volume of parts ordered from The Flxible Company has been $15,000.00 a year, and this figure includes the present year of 1958."

After the bus in question was involved in the accident at Lincoln, a service representative of Flxible named James Acton came to Nebraska. He examined the bus early in January of 1957.

In summary, the Court finds a company which does not have any telephone, or office, maintain any employees, or own any property in Nebraska. However, it has a regional representative based in Minneapolis. He, or some other representative, from 1954 until shortly after the accident, visited with Mr. Aikman or some other official of American three or four times a year, inquiring whether American was considering buying more buses, and how the present buses were operating. He passed complaints back to the manufacturer. It does not appear whom else he may have visited in Nebraska, but he states that he contacts "possible purchasers of buses" although he does not directly take orders or make contracts for Flxible in Nebraska.

Flxible sent a man to testify before the Reorganization Court in Lincoln, if it were necessary to gain approval for the sale of its buses to the debtor.

When the buses began arriving in Omaha in 1956, Flxible's service representative, Mr. Shenberger, conferred with American's service personnel about maintenance and service of the Flxible

buses. Thereafter, a Flxible representative and a representative of the manufacturer of the motors for Flxible buses conducted a one-day school for American service employees in Omaha. Other Flxible service representatives called "from time to time" at the American garage in Omaha.

Mr. Shenberger came to Omaha three or four times in the summer and fall of 1956 concerning air-conditioning problems with Flxible buses. A Flxible service representative spent about ten days in November of 1956 in Omaha replacing or repairing certain shift assemblies on two 1955 model Flxible buses. Parts were furnished for this and other jobs by Flxible and Flxible paid for labor spent by American employees working on the Flxible buses.

These thirty-one buses cost about $27,-000 each or a total of approximately $837,000, and parts ordered from Flxible for 1956, 1957 and 1958 averaged $15,-000 a year. Mr. Aikman speaks of a "warranty" which may or may not cover part or all of these parts mentioned.

The Court was not shown, in the hearing, a copy of a contract showing either the presence or absence of such a warranty. It is reasonable to expect that some sort of warranty was included. Even if not, it cannot rationally be assumed that Flxible was actuated to provide free parts, pay for labor done, and send service representatives to Nebraska, out of philanthropic motives. This type of service is calculated to promote good public relations through satisfied customers, and thereby to ultimately enhance the position of Flxible among persons who may be "possible purchasers of buses."

After this lengthy discussion of the underlying facts concerning "doing business", we turn to the law on the subject.

The defenses raised by the third-party defendant embrace the questions of: (1) lack of jurisdiction over the corporate person; (2) improper venue; and (3) insufficiency of process or service of process. "Jurisdiction" as used herein, refers only to personal jurisdiction and not subject-matter jurisdiction.

The Court has examined quite a number of cases dealing with the above defenses and their interrelationship especially as to (1) and (2). The different methods of approach to the problem reveal the confusion extant in the area. In a great number of cases the question of venue is ignored and only the question of jurisdiction is raised. In some cases both defenses are raised, but the decision goes merely to jurisdiction and this is apparently treated as disposing of the case.

The case of Polizzi v. Cowles Magazines, Inc., 1953, 345 U.S. 663, 73 S.Ct. 900, 902, 97 L.Ed. 1331 serves to point up the confusion. The District Court dismissed the action on the ground that it did " 'not have jurisdiction under Section 1391, sub-section C, New Title 28, United States Code' because Respondent 'was not, at the time of the service of the summons, doing business in [the Southern District of Florida].' " This of course confuses jurisdiction and venue, because the cited statute refers only to venue. The Circuit Court affirmed, 5 Cir., 197 F.2d 74, but the Supreme Court reversed. The Court stated at page 665 of 345 U.S., at page 902 of 73 S.Ct.:

> "Section 1391 is a general *venue* statute. *In a case where it applies, if its requirements are not satisfied, the District Court is not deprived of jurisdiction,* although dismissal of the case might be justified if a timely objection to the *venue* were interposed." (Emphasis supplied.)

It must be clear that there is a substantial distinction between jurisdiction and venue. If the Court is without jurisdiction, then in the absence of a waiver of the defense, the Court is without power as to that party and must dismiss. Venue, on the other hand, relates only to the place of trial. If venue is laid in the wrong district, then the Court does have power, "if it be in the interest of justice" to transfer the case to a district or division in which the case

could have been brought. Title 28 U.S.C.A. § 1406(a). This power necessarily assumes the court has jurisdiction.

The Court does consider the defenses concerning insufficiency of process and lack of personal jurisdiction to be completely interwoven, however. A party might potentially be subject to the court's jurisdiction, but until there was a proper service of process (including substituted service) or appearance, the court would not have jurisdiction. On the other hand, if the court was without jurisdiction from the outset, an attempted service would be void. The Court will, therefore, discuss the issues only under two main groups: jurisdiction and venue.

### Jurisdiction

Service of process was made by serving the Secretary of State of the State of Nebraska, as agent for Flxible. As to serving a corporation, Federal Rule Civil Procedure, 4(d), 28 U.S.C.A., provides in part as follows:

> "Service shall be made as follows: * * * (3) Upon a domestic or foreign corporation * * * by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process * * *."

> * * * * * *

> "(7) Upon a defendant of any class referred to in paragraph * * * (3) of this subdivision of this rule, it is also sufficient if the summons and complaint are served in the manner prescribed by * * * the law of the state in which the service is made for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state."

It is obvious that the service in this case was made under color of Neb.Rev.Stat. § 21–1201 (Supp.1957) which provides for such service in certain cases.

Since the state law is the legal vehicle by which service was made, the first question must go to whether or not such service is proper under the Nebraska law. If it is proper, the next question would be whether such service was constitutional. In light of the facts of this case, the answer to the second question must in all events be in the affirmative. In the case of McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, it was held sufficient business contact to have one insurance policy delivered into a state with the insured sending his premiums to the out-of-state insurer. There was absolutely no other evidence of business contact, but it was held sufficient so that the state could give mailed service, and bind the outstate insurer.

There is some authority that Federal Rule 4 only refers to the *method* of service and that whether or not the corporation is *amenable* to service is a question which may or may not be one of "general law". See Bar's Leaks Western, Inc. v. Pollock, D.C.Cal.1957, 148 F.Supp. 710 for a discussion of the subject. Whether some "general law" about service of process or amenability to process might be applicable when an attempt is made to serve by a means not contemplated by the State law is not before the Court. In this case, service is contemplated under the State law, and the only jurisdictional question of amenability, as viewed by this Court, is whether such service is constitutional. Having determined that the above-discussed facts are more than adequate to meet the constitutional test, the question remains as to whether service is valid in this case under the State law.

The applicable statute is Neb.Rev.Stat. § 21–1201 (Supp.1957). Without attempting to extract specific words from the statute, the Court concludes that such service is authorized if the corporate third-party defendant was "doing business" in Nebraska even though no agent to receive service had been appointed. As recently stated by the Nebraska Court:

"Even though a foreign corporation has not expressly consented to such jurisdiction but is actually doing business in this state, then a valid service of process may be made against it upon the Secretary of State. Wilken v. Moorman Manufacturing Co., 121 Neb. 1, 235 N.W. 671; Yoder v. Nu-Enamel Corp., 140 Neb. 585, 300 N.W. 840." Brown v. Globe Laboratories, Inc., 1957, 165 Neb. 138, 147, 84 N.W.2d 151, 157.

In accord: McMaster v. Robinson's Women's Apparel, Inc., D.C. Neb.1942, 45 F.Supp. 99.

This Court must attempt to forecast what the Nebraska Court would do if the question were before it. At the outset, one finds a familiar rule stated in Brown v. Globe Laboratories, supra, where it is said:

"No all-embracing rule can be laid down as to just what constitutes the manner of doing business by a foreign corporation in order to subject it to process in any given jurisdiction. Each case must necessarily be determined by its own facts. * * *" 165 Neb. 147, 84 N.W.2d 157.

In the Brown-Laboratories case, supra, an agent living in Iowa apparently traveled through Nebraska as part of his territory and solicited orders from retailers which he turned over to wholesalers who purchased their products from the party. Also, he conducted schools or exhibitions showing dealers, farmers, and students (including G.I. students) movies of animal diseases and their treatment with the defendant's products. These schools were to promote sales and acquaint those present with the defendant's products. This was held to constitute "doing business."

In the case of Pitzer v. Stifel, Nicolaus & Co., Inc., 1943, 143 Neb. 394, 9 N.W. 2d 495 the court held that the foreign corporation was not doing business in Nebraska. In that case, the defendant had made a contract with an attorney to handle all local legal matters in connection with its attempt to sell a bridge.

The court does not describe any activities in which the attorney may have engaged on behalf of the defendant, but holds that this single contract, without more, is not sufficient to constitute doing business. The court did state that in cases *such as* the case of Beach v. Kerr Turbine Co., D.C.Ohio 1917, 243 F. 706 there might be a situation in which a single contract would be sufficient to say that the party has engaged in business in the state. The facts and reasoning of that case considered by the Nebraska Court were that "under the single contract involved therein wherein the corporation sold three turbine pumps, same to be installed, defendant had become subject to the jurisdiction of that state for the following reasons: 'It is true, we are dealing only with a single contract or sale; but the terms thereof required the foreign corporation to come into the state with its agents and employés and perform certain acts—in other words, to do business.'" 143 Neb. at page 400, 9 N.W.2d at page 498.

In the case of McMaster v. Robinson's Women's Apparel, D.C.Neb.1942, 45 F. Supp. 99, 101 it appeared that the defendant had no office or place of business in Nebraska. It had, however, purchased various supplies in Nebraska, while engaged in construction operations. Those operations consisted of:

"(a) remodeling the store of its co-defendant, in Lincoln, pursuant to the contract dated September 28, 1940, in the course of which it commenced work October 4, 1940, finished its work about November 26, 1940, and received final payment February 10, 1941; and

(b) remodeling of two stores in Omaha pursuant to a contract made on or about January 15, 1940, in the course of which it commenced work in February of 1940 and continued operations till April of 1940." 45 F.Supp. 101.

Judge Delehant, interpreting the Nebraska law, held that this was "doing business".

The case of Keppel v. E. W. Wiggins Airways, Inc., D.C.Mass.1952, 103 F. Supp. 911 is somewhat similar on its facts to the case at bar. The defendant there owned an airplane which crashed, killing several persons and upon being sued, impleaded the manufacturer. The manufacturer claimed it was not "doing business" in the state. The facts showed that two men were maintained in the state to encourage distributors to order the manufacturer's product, promote goodwill and investigate complaints. The manufacturer maintained a warranty on the goods sold, and paid for repairs made under such warranty. It was held that this constituted "doing business."

While in the case at bar, no one was permanently maintained in Nebraska, Nebraska was part of McKinney's territory. McKinney regularly visited American and inquired as to complaints and as to whether more buses would be purchased. Also he "contacts possible purchasers" apparently other than American, although the extent of his other activity is not clear. Flxible apparently has some sort of warranty under which it either supplies or pays for some of the parts and service expended on the buses purchased by American.

In light of these facts and the other facts recited above, the Court concludes that Flxible was "doing business" within the contemplation of the Nebraska law.

■ It may also be appropriate to note the Nebraska rule that if a foreign corporation has been doing business in Nebraska so as to subject it to such service, ceasing to do business prior to the bringing of the action does not negate its amenability to service. Yoder v. Nu-Enamel Corporation, 1941, 140 Neb. 585, 300 N.W. 840. Due to the proximity of time between the proof of the last "business" in Nebraska, and the bringing of this suit, no due process objection is available, such as might be the case if the corporation had ceased to do business in the distant past.

From the foregoing, the Court concludes that the Nebraska law authorizing substituted service on foreign corporations doing business in the State was properly invoked by this Court.

■ From this, the Court turns to the question of venue. The mere fact that one has subjected himself to state jurisdiction does not necessarily mean that the federal venue will be correct if the federal district court uses the type of service authorized by the state law. This was expressly determined in the non-resident motorist cases. Olberding v. Illinois Central R. Co., Inc., 1953, 346 U.S. 338, 74 S.Ct. 83, 98 L.Ed. 39; Lied Motor Car Co. v. Maxey, 8 Cir., 1953, 208 F.2d 672; Craft v. Murphy, D.C.Ala. 1957, 156 F.Supp. 486.

Venue

■ The first question is whether the general venue statute or the venue provisions for removed actions controls this case. It will be recalled that this is a removed case, but that the third-party defendant was impleaded after the case was removed. Title 28 U.S.C.A. § 1441 (a) (1950) provides:

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

The foregoing is the venue provision for removed actions. The general venue statute is Title 28 U.S.C.A. § 1391(c) (1950) which provides:

"A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

In the case of Polizzi v. Cowles Magazines, Inc., 1953, 345 U.S. 663, 665, 73 S.Ct. 900, 902, 97 L.Ed. 1331 the defendant foreign corporation was sued in the

courts of Florida and removed the case to the District Court for the Southern District of Florida. There, it attempted to raise the question of venue, [actually the lower court referred to jurisdiction] on the ground it was not "doing business" in Florida, as provided in § 1391(c). The Supreme Court stated:

"Section 1391 is a general venue statute. In a case where it applies, if its requirements are not satisfied * * *, dismissal of the case might be justified if a timely objection to the venue were interposed. 28 U.S.C. (Supp. V) § 1406. But even on the question of venue, § 1391 has no application to this case because this is a removed action. *The venue of removed actions is governed by 28 U.S.C. (Supp. V) § 1441(a)* and under that section venue was properly laid in the Southern District of Florida." (Emphasis supplied.)

In the case of Fawick Corporation v. Alfa Export Corporation, D.C.N.Y.1955, 135 F.Supp. 108 the court noted the Polizzi case and held that defendants who were added by amendment *after* the original defendants had removed the case to the federal district court were precluded from raising the venue question under § 1391, venue being controlled by § 1441(a). The District Court in Alabama was subsequently faced with precisely the same situation and as to the defendants added after removal, permitted them to raise the § 1391 venue objections. The court declined to follow the Fawick case, pointing out the inequities of such a rule. It was determined that the action was commenced as to these defendants only when the amendment adding them as parties was filed. Thus, the action as to them had never been "removed". Craft v. Murphy, D.C.Ala.1957, 156 F.Supp. 486.

This Court accepts the Craft case as better reasoned. In this case there was never any "action brought in state court" against Flxible and the removal statute is thus inapplicable. To hold to the contrary would mean that Flxible's venue defense was lost by the act of the third-party plaintiff before Flxible, the third-party defendant, had participated in the case at all. In effect it would obviate the defense in such cases. The Court believes the general venue statute applies.

Turning then to § 1391(c) it appears that a corporation may be sued in a judicial district: (a) where it is incorporated, (b) where it is licensed to do business, or (c) where it is doing business. Since Flxible is neither incorporated in nor licensed to do business in Nebraska, the venue is proper only if it is "doing business" in Nebraska.

The Court must thus determine what the "doing business" test means. Some courts seem to equate the doing business test in the venue statute with the constitutional test employed when the Supreme Court is determining whether a state has power jurisdiction to bind a party. See, inter alia, Satterfield v. Lehigh Valley R. Co., D.C.N.Y.1955, 128 F.Supp. 669; Neris Carbon & Oil Corp. v. Transcontinental Oil Co., D.C.N.Y. 1957, 156 F.Supp. 790.

This does not appear to this Court to be a correct view of the law. The Supreme Court has recognized the distinction between the doing business test and the test laid down in the International Shoe case. In McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 222, 78 S.Ct. 199, 200, 2 L.Ed.2d 223 the court traced the history of the constitutional tests:

"In a continuing process of evolution this Court accepted and then abandoned 'consent,' *'doing business,'* and 'presence' as the standard for measuring the extent of state judicial power over such corporations. * * * More recently in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, the Court decided that 'due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum

contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " (Emphasis supplied.)

It may thus be seen that the "doing business" test is a quantitative measure formerly used by the courts as a measure of constitutional power and now used by Congress as the legislatively desirable test of venue when it is desired to sue a corporation.

In the case of Remington Rand, Inc. v. Knapp-Monarch Company, D.C.Pa. 1956, 139 F.Supp. 613, District Judge Wright has made an excellent analysis of the venue provision. It has long been the law that a corporation resided only in the state of its incorporation. Under the former venue statute, suits based on diversity jurisdiction were required to be brought in the state of either the plaintiff's or defendant's residence. Thus a non-resident plaintiff who sued in a district other than the state of defendant's incorporation was subject to the defense of improper venue. In the case of Neirbo Co. v. Bethlehem Shipbuilding Corp., Ltd., 1939, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, this concept was modified to the extent that if the foreign corporation had appointed a resident agent under the local foreign corporation laws, it was deemed to have waived its venue defense and could be sued there.

The question then arose as to whether foreign corporations which complied with state law and appointed agents were to be subject to suit, while those who violated state law and failed to appoint an agent were still free to raise the venue defense. Judge Wright cites the following cases as holding that some courts held that this anomalous result was the law. "Moss v. Atlantic Coast Line R. Co., 2 Cir., 1945, 149 F.2d 701; Robinson v. Coos Bay Pulp Corp., 3 Cir., 1945, 147 F.2d 512; see also: Knobloch v. M. W. Kellogg Co., 5 Cir., 1946, 154 F.2d 45." 139 F.Supp. at page 616.

Against this background, Judge Wright concludes that Congress enacted § 1391(c) which changed the concept of corporate residence and provided that if a corporation was in fact "doing business" it could not raise the venue defense even though it had failed to appoint an agent. It is thus concluded that the concept of "doing business" is equated to the standard of whether the corporation ought to have obtained a license and appointed a resident agent. He does not feel, however, that the requirements of the particular state control, but that this should be a uniform federal standard.

■ This Court is in substantial agreement. The venue provisions of § 1391(c) must be uniform throughout the federal system. The Court also agrees that it is a test which incorporates the thought that the corporation ought to have appointed a resident agent. Presumably that test is employed when it is deemed that a corporation is "doing business" for jurisdictional purposes and for purposes of service of process. (The Court is here speaking of the usual corporation statutes—not special statutes such as non-resident motorist statutes or statutes such as applied in the McGee case.) Thus, this test will usually be the same as a state test for doing business, but would be uniform and would certainly not be bound to follow any particular state court decisions.

After this is all stated, however, this Court feels that the test is nothing more nor less than the old test of "doing business" which was formerly employed as a constitutional yardstick for state jurisdiction and process. The leading case in the field is thus still the case of Green v. Chicago, Burlington & Quincy R. Co., 1907, 205 U.S. 530, 27 S.Ct. 595, 51 L. Ed. 916. There is a vast multitude of federal cases on the point, and one finds the usual phrases about each case depending on its own facts. Roark v. American Distilling Co., 8 Cir., 1938, 97 F.2d 297.

Therefore, in applying the "doing business" test to the facts of the case at bar, the Court believes, although Nebraska law does not control the Court,

 

that the tests for jurisdiction to serve process on a foreign corporation under Nebraska law and for venue under § 1391(c) are essentially the same.

It is the opinion of this Court that The Flxible Company was, under the facts cited in the earlier portion of this opinion, doing business within this district as provided in § 1391(c).

An appropriate order will this day be entered.