BERNICE M. MCNAUGHT, APPELLEE, v. NEW YORK LIFE INSURANCE COMPANY, APPELLANT.

18 N. W. 2d 56

FILED MARCH 9, 1945. No. 31846.

*Brown, Crossman, West, Barton & Fitch* and *Thomas F. Neighbors*, for appellant.

*Floyd E. Wright* and *Fred A. Wright, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

This action was instituted by the widow and beneficiary of the deceased upon a double indemnity agreement attached to a life insurance policy, which provided that, upon the payment of an additional premium, the company would pay $1,000 for the accidental death of her husband. The jury returned a verdict for $1,208.84. Motion for a new trial being overruled, a judgment was entered for the plaintiff in the amount of the verdict, together with attorney's fees in the sum of $400, from which judgment the defendant insurance company appealed.

In the first trial of this same case, the trial court sustained a motion for a directed verdict for the defendant at the close of the plaintiff's evidence, and dismissed the action, which ruling, upon appeal to this court, was reversed in an opinion appearing in 143 Neb. 220, 12 N. W. 2d 108. The present appeal is from the second trial in the district court.

The action was based upon a policy of insurance, which reads in part as follows: "NEW YORK LIFE INSURANCE COMPANY agrees to pay to the Beneficiary under said Policy, in addition to and together with the amount payable under the terms of said Policy upon the death of the Insured, ONE THOUSAND Dollars upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury * * * ; provided, however, that such Double Indemnity shall not be payable if the Insured's death resulted, directly or indirect-

ly, from * * * (h) illness or disease; or, (i) any bacterial infection other than that occurring in consequence of accidental and external bodily injury."

The plaintiff's evidence may be summarized as follows: Homer R. Pease, a clerk who had been employed for 20 years at the Palace Hotel in North Platte, testified by deposition that the deceased had been an occasional guest at the hotel over a period of four or five years, sometimes staying one day, up to as high as seven or eight days in a month; that in August of 1940 he registered at the hotel and remained there for a few days; that at 9:30 one morning deceased came down from his room and limped, and he had not limped the day before, and that witness went up to his room with him, where the deceased removed his trousers and rolled up his shirt sleeves and disclosed black-and-blue bruises; that one near the elbow was about the size of a dollar; that his leg was hurt and his head was also injured some, and that the deceased had some lotion which the witness rubbed upon the arm and the leg; that he did not see any of these injuries the afternoon before.

On cross-examination he said that he could not remember which arm or leg it was that he rubbed the lotion on. He said the injury to the head was some kind of a break in the skin on the forehead and above the eye. He testified that Mrs. McNaught came down on the train that night, but did not register because they compliment the wife of a traveling man, and so she just went up to his room. He said that after he had rubbed the lotion on the injuries of the deceased he did not see him again that day, but saw him the morning he checked out, and his wife was with him.

The plaintiff testified that they had been married about ten years; that her husband, as representative of the Mankato Brewing Company, traveled the whole state of Nebraska; that they were living in Omaha, but he had driven her out to Scottsbluff to visit her folks while he worked around in western Nebraska; that he was in good health when he left her the middle of July; that she went to North Platte to ride to Omaha with him; that he came up to their room in

the hotel about 10:30 to 11:00 p. m., after she had gone to bed; that she noticed bruises on his arm, chest and ankle, consisting of a dark discoloration on the left forearm, just below the elbow, as big as the palm of her hand, on the right chest just below the collarbone, and a severe bruise on the ankle. She was not allowed to give the conversation with her husband as to how these bruises occurred. She testified that on the following Saturday morning, August 17, they drove to Omaha, arriving there late at night; that the discoloration on his arm remained for two weeks after they reached Omaha. She further testified that on the night of September 7 her husband became ill. Dr. McGee was called, who had him taken to the Lutheran Hospital, where his death occurred.

Dr. John W. McGee testified by deposition that he had been practicing in Omaha since 1925, and was called to see deceased at his home because of severe chest pains on September 8, 1940, and stayed several hours. "When I first saw him he was very seriously ill, and I thought he was going to die. He looked like it. He was still able to stand up, but he was in terrific pain. * * * I diagnosed his condition as an emboli, probably of the chest."

He returned early the next morning and stayed until about noon, then saw him again about 4 p. m., and had him removed to the hospital. "This thing started as a tremendous thing right off the bat."

Dr. McGee said he continued to treat him until his death September 17. In answer to the question as to the cause of death, Dr. McGee testified: "I feel that he died of an emboli for the reason that he had been feeling quite well except for an occasional sharp pain in his left chest. He had been temperature free. He just had a little bit of temperature the first day he was in the hospital. Third day temperature down to normal, occasionally got the chest pains no raise of temperature. I think it was undoubtedly an embolic condition. * * * There is no question about that. He may have had besides pulmonary emboli, coronary emboli—emboli of the heart, but I felt the main cause of death

was the pulmonary emboli. * * * Q. What other action can occur from the blood clots? A. If it hits a vital area you die. Q. What do you mean by a vital area? A. If it hits coronary artery it disturbs the action of the heart enough to stop it. If it would hit an end artery like the brain, like a respiratory center, it would stop it right there. In my death certificate I said the primary cause of death was pulmonary emboli but this man had coronary emboli too. Q. Coronary emboli? A. Coronary emboli—it is a small clot that will hit an end artery of the coronary artery supplying the heart itself. Q. Would that cause death? A. That could cause death, surely. Q. What generally are the causes of an emboli? A.Usually there is a history of an injury. Q. What kind of an injury? A. Where a vessel has been bruised hard enough that it has stagnated enough to form a clot. * * * Q. And the fact is, Doctor, that when you made out this death statement you did not feel that it was the result of the accident—you aren't certain now? * * * A. I wasn't entirely certain that it was the result of the accident. I know of no other known cause for the emboli. Yet, there is no question but that it was an embolic death."

Dr. Ralph J. Malott, a graduate of Northwestern University Medical School, had practiced medicine at Scottsbluff since 1929, and testified that he treated deceased for influenza in February, 1940, that he fully recovered, and after his recovery he examined his heart and the condition of his heart was normal. He was asked this hypothetical question: "Q. Now, Doctor, assuming that on or about the 15th of August, 1940, William McNaught received an injury to his arm in the vicinity of the forearm, near the elbow, which was somewhat painful and became discolored, the size of the discoloration being about the size of the palm of Mrs. McNaught's hand, and that the discoloration remained on the arm for about two weeks, and then on September 7, 1940, Mr. McNaught became ill and suffered with severe pain in the chest, and then taking into consideration the hospital charts, which are Exhibits A, A-1 to A-20, which you have examined, do you have an opinion as to what

caused the death of Mr. McNaught on September 17, 1940?" and after objection and ruling thereon answered: "I believe Mr. McNaught's death was due to coronary embolus."

The witness was then asked another hypothetical question, ending with the following: "considering the matters contained in the hospital charts, which are Exhibits A and A-1 to A-20, which you have just examined, and taking into consideration your knowledge of the physical condition of William C. McNaught, do you have an opinion as to what caused the embolus which you stated caused his death? * * * A. I think Mr. McNaught died of coronary embolus which arose from the site of the injury to his left arm. * * * Q. Do you have an opinion as to where this blood clot originated? * * * A. Yes. Q. Where, in your opinion, did it originate? * * * A. It originated at the site of this contusion on his arm."

The defendant's witnesses consisted of three physicians. Dr. R. H. Whitehead, Jr., testified by deposition that on September 17, 1940, he was a resident physician of the Lutheran Hospital, Omaha, Nebraska; that just before McNaught died he was called, and was with him for about 30 minutes before he died, administering nasal oxygen, and that his diagnosis of the death was cardiac decompensation with possible coronary occlusion; that he did not see anything which would have indicated to him that the death was caused by accidental injuries.

Defendant's exhibit A-4, being a hospital chart, signed by Dr. Whitehead, reads in the last paragraph as follows: "9-17-40 Pt (*patient*) while being taken from bed pan suddenly complained of pain in chest (12 midnite) and not able to get air ect Face became cold and clammy and respiration increased. Was pulseless. In spite of stimulents and nasal oxygen he became weaker and expired at 12:30 A. M. Cause of death cardiac decompensation or possible coronary occlusion Whitehead."

On cross-examination Dr. Whitehead testified that he knew that Dr. John W. McGee was treating the patient; that he had seen McNaught twice, once the day before and

at the time he expired. He testified that a pulmonary embolus is caused by a clot of blood breaking away from the scene of an injury, striking the lungs and causing sudden death; that he did not believe he had ever seen a man pass out from pulmonary emboli; that it is hard to prove unless they perform an autopsy.

Dr. Frank W. Plehn testified that he had practiced medicine in Scottsbluff since 1907; that he had examined the Lutheran Hospital charts in evidence, covering the entire hospital record of William McNaught from September 8 to September 17, 1940. He answered a hypothetical question that, from the study of the charts, in his opinion McNaught died from a disease of the coronary artery of the heart, and the cause of death was coronary thrombosis; that the hospital records and the facts assumed in the hypothetical question form almost a textbook record of the symptoms of coronary thrombosis; that he could conceive of no accident that would result in a coronary thrombosis, which comes as a result of a disease of the lining of the arteries; that he could not agree with the conclusion reached by Dr. McGee that McNaught died from pulmonary emboli from an injury received two weeks previous.

Dr. W. C. Harvey testified that he was a graduate of the University of Nebraska college of medicine, had practiced since 1920, and was on the staff of the Methodist Hospital and of the Fair Acres Hospital at Scottsbluff; that he had made a study of the exhibits in this case, and in answer to a hypothetical question said the deceased died of coronary occlusion; that the underlying cause of this is an inflammatory condition of the lining of the coronary artery, which may be accompanied by a hardening of the outer wall, and a clot is formed because of the inflammatory condition of the lining of the artery, which shuts off the blood flowing through.

The defendant assigns twelve errors relied upon for a reversal of the judgment in the case at bar. The first five errors assigned charge that the evidence was not sufficient to sustain the judgment, which was contrary to the evi-

dence and to the law; that the defendant's motion to dismiss the action at the close of the plaintiff's evidence, and again at the close of all the evidence, should have been sustained.

In order that we may pass on these first five assignments of error, we have hereinbefore set out a brief summary of the evidence showing the facts of the injury suffered by the deceased at North Platte, and the testimony of the plaintiff's medical experts, together with the evidence leading to the direct conclusion that the death of McNaught was due to a clot arising at the site of the injury he had received in his arm, while on the other hand the medical experts for the defendant insurance company testified that the death was caused by a diseased condition, or inflammation, of the lining of the arteries, which in no way was caused by the accident, and hence there could be no recovery under the terms of this policy, according to the evidence given by defendant's witnesses.

Dr. McGee testified that deceased came to his death from pulmonary emboli, and he was asked on cross-examination: "Q. And the cause of that emboli was and still is obscure in your mind? A. The only known cause that I could find was this blow on the right arm."

In a compensation case in which the facts relating to the death were somewhat similar, a milkman cut his hand on a broken bottle. His death occurred from coronary thrombosis six months later. In the cross-examination of his doctor appears the following testimony: "Q. Doctor, was it your opinion that you thought he died of this coronary thrombosis merely because you couldn't find any other reason to account for his death? A. That is the only logical conclusion I could come to. Q. Under the circumstances then it would be just equivalent to hazarding a guess as to what he died from? A. No, it is not a guess; it is a conclusion." The superior court decided that the theory and conclusions of Dr. Biddle were sufficient in quality to sustain the award, and entered judgment for claimant. *Swalm v. J. H. Brokhoff, Inc.*, 145 Pa. Super. Ct. 218, 20 Atl. 2d 797.

In the case of *Petruzzi v. A. Levy & Co.*, 108 Pa. Super. Ct. 566, 165 Atl. 543, deceased sustained a bad fracture of his left arm near the wrist on December 14, 1928. On May 7, 1929, the bone was rebroken and reset. On May 21 he suffered from paralysis of the left arm and leg, and on September 8 died of an embolism. The superior court of Pennsylvania held that, while experts testified that he had a heart murmur and it was possible that his death might have come as a result of the heart condition, the board accepted the evidence that the embolus came from the rebreaking of the wrist rather than the heart murmur.

In a very similar case to the one at bar, viz., *Kundiger v. Prudential Ins. Co. of America*, 17 N. W. 2d (Minn.) 49, we have an action in which the causal connection between any bodily injuries and his subsequent death was admittedly a highly scientific question. Lay jurors could not intelligently determine from their own knowledge and experience whether the injuries were the sole cause of death; hence, without some supporting expert medical testimony, there would have been no proper foundation for a finding by the jury that the injuries were the sole cause of death. The jury did not sit simply to count the number of expert witnesses, nor was it required to accept or reject the testimony of each expert *in toto*. His testimony, like that of any other witness, could be believed in part and disbelieved in part.

"The opinions of medical experts are not conclusive, but are to be weighed by the jury like all other evidence. The jury may act against the greater number of opinions, and in favor of the fewer; for the opinion of one expert may, on account of his greater knowledge and experience on the subject, or from his giving fuller details of the case, or more probable reasons for his opinion, be of greater value to the jury than the opposite opinions of several." Lawson, Expert and Opinion Evidence (2d ed.), 177.

" * * * when expert opinion as to causation is admissible, the weight of the opinion is to be determined by the jury." 20 Am. Jur., sec. 867, p. 732.

In a very recent opinion by this court, *Long v. Railway*

*Mail Assn.,* decided February 16, 1945, *ante,* p. 623, 17 N. W. 2d 675, we said: "Where an expert witness gives an opinion based upon facts established by the record upon a matter recognized as a proper subject of expert opinion, unless impeached to such an extent as to have no probative value, it is ordinarily sufficient to sustain a verdict."

Therefore, in the case at bar, when the contradictory and conflicting evidence of the medical experts could not be reconciled as to whether an accident or existing disease caused the death of the insured, there was presented a definite jury question, and the trial court was justified in overruling the two motions made by the defendant for a directed verdict.

We will next consider the objection of the appellant to permitting Dr. McGee to testify that in getting the history from the deceased he was told deceased had sustained a blow to his right arm. It is insisted that this was not necessary for a diagnosis or treatment, and, being so long after it had occurred, it was simply a narrative of a past event and hearsay, and its admission prejudicial.

In *Block v. Milwaukee Street Ry. Co.,* 89 Wis. 371, 61 N. W. 1101, a doctor was allowed to testify to statements made to him by the patient a year and a half after the accident.

In *Sweeney v. Midwest Life Ins. Co.,* 129 Neb. 521, 262 N. W. 47, the evidence disclosed that the deceased slipped and fell on October 19, 1931, and that her death occurred December 2, 1931. Dr. Hanisch was allowed to testify to the personal history given by the deceased on November 13, which lapse of time after the accident and before the history was given was similar to the lapse of time in the case at bar.

"Physician's Knowledge of Symptoms based on Hearsay of Patients and Others. Here, again, the law cannot afford to stiltify itself by refusing to recognize, in testimonial rules, the safe and accepted practices of medical science. When a physician examines a patient to ascertain his ailment and to prescribe for it, a portion of his reasons for action must be the patient's own statements. To exclude testimony not wholly independent of this foundation for

opinion is, in strictness, to exclude almost always medical testimony based on a personal examination. * * * Any attempt to draw the line in rulings, and to exclude a physician's testimony because his diagnosis is based in part on such statements, is unpractical, and defies the usual processes of medical thought. Hence it should be avoided." 3 Wigmore, Evidence (3d ed.) sec. 688, p. 4.

The approved rule in regard to physician securing a history from the patient to enable him to properly treat the patient is announced in annotation, 65 A. L. R. 1223, as follows: "The opinion of a physician or surgeon as to the condition of an injured or diseased person is not rendered incompetent by the fact that it is based upon the history of the case given by the patient to the physician or surgeon on his examination of the patient, when the examination was made for the purpose of the treatment and cure of the patient." This rule is supported by opinions there cited from many states.

The sixth and seventh assignments of error relate to the refusal of the court to submit to the jury instructions Nos. 4 and 5 requested by the defendant. An examination of the instructions as given by the court discloses that instruction No. 9 set out all of the terms of the double indemnity agreement, and No. 11 required the plaintiff to show that the deceased came to his death solely through external, violent and accidental means, and instruction No. 12 instructed the jury that, if the deceased came to his death from illness or disease, their verdict would be for the defendant. These three instructions included everything asked by the defendant in instructions Nos. 4 and 5 as submitted by it, and there was therefore no error in rejecting these tendered instructions. See *Merritt v. Ash Grove Lime & Portland Cement Co.*, 136 Neb. 52, 285 N. W. 97.

The defendant's eighth and ninth assignments of error charge that the testimony of Dr. McGee that the deceased told him he had sustained a blow on his arm, which we have already discussed, and the receiving in evidence of exhibit No. 1, the death certificate, signed by Dr. McGee on Septem-

ber 17, 1940, constituted prejudicial error. This death certificate gave as the cause of death pulmonary emboli. After the words "Due to" there was filled in by Dr. McGee "Probly. from injury received 2 wk. previous", and again the printed words "Due to", after which was filled in, "Blow on R. arm."

We find in *Omaha & C. B. Street Ry. Co. v. Johnson*, 109 Neb. 526, 191 N. W. 691, that it was held by this court in 1922 that in a case under the workmen's compensation law such medical certificate of death was incompetent when offered as proof of the cause of death as shown by the recitals therein. In that case no one of the physicians who attended the deceased was called upon to testify, but in the case at bar Dr. McGee, who signed the certificate of death, testified in his deposition to all of the statements found in the medical portion thereof, and one of these answers, to which objection was made and overruled, reads: "Patient gave a history of having been hit on the right arm August 12, 1940, also of having a pain in arm up to the time of the sickness."

Contrary to the rule expressed in this Nebraska decision, many states permit a death certificate to be received in evidence as presumptive evidence of the facts stated therein. See 16 Am. Jur., sec. 16, p. 18; Annotations, 42 A. L. R. 1454, and 96 A. L. R. 324.

However, in the case at bar, since Dr. McGee testified to all the points criticized in this exhibit No. 1, the ruling of the court would not be prejudicial, or require a reversal of the case.

The last assignments of error charged by the defendant as prejudicial embrace the overruling of the motion for a new trial, the allowance of attorneys' fees, and the overruling of the motion to retax costs.

It is argued that if $400 is allowed for a two days' trial it is highly exorbitant, that it would be error to allow any attorneys' fees for the first trial because the trial court instructed a verdict for defendant, and that such a fee is so unreasonable as to be punitive rather than compensatory.

In defense of these fees, the plaintiff argues that preparation for trial included the taking of depositions in Omaha, North Platte and Dallas, Texas, and two contested trials in the district court, and that $400 is not excessive for the services rendered.

Section 44-359, R. S. 1943, directs the court in such cases to allow a reasonable sum for attorney's fee, to be taxed as part of the costs, and that this court shall also allow a reasonable sum in the appellate proceedings.

In *Gillan v. Equitable Life Assurance Society,* 142 Neb. 497, 6 N. W. 2d 782, a judgment was recovered of $102.40, and the district court allowed $500 attorney's fees, and this court in addition allowed $200. In *McCleneghan v. London Guarantee & Accident Co.,* 132 Neb. 131, 271 N. W. 276, the judgment was $2,700, and district court attorney's fees of $300 were allowed, and $200 was allowed in this court.

In all such cases, the trial court has observed the course of the proceedings, and has considered the amount involved, the questions of law raised, the time and labor necessarily involved, as well as the professional diligence and skill required, and when all these facts are considered it does not appear to us that there has been any abuse of discretion in fixing the fee in the district court at $400. In regard to the fee in this court, it was argued to this court after the first trial in the lower court, and then reargued upon the direction of this court. It has now been argued here for the third time, and we fix the attorneys' fee in this court at the sum of $300.

Finding no prejudicial error, the judgment of the trial court is hereby affirmed.

AFFIRMED.