Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/05/2018 08:12 AM CDT

State of Nebraska, appellee, v.
Edward Hood, appellant.
___ N.W.2d ___

Filed October 5, 2018.    No. S-17-637.

1. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

2. **Effectiveness of Counsel: Appeal and Error.** An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

3. **Criminal Law: Juries: Evidence: Appeal and Error.** In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the error was harmless beyond a reasonable doubt.

4. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

5. **Trial: Evidence.** The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

6. **Effectiveness of Counsel: Records: Appeal and Error.** A claim of ineffective assistance of counsel may be resolved when the record on direct appeal is sufficient to either affirmatively prove or rebut the merits of the claim. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be

able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

7. **Effectiveness of Counsel: Proof: Appeal and Error.** When making an ineffective assistance of counsel claim on direct appeal, allegations of prejudice are not required. However, a defendant must make specific allegations of the conduct that he or she claims constitutes deficient performance.

8. **Postconviction: Effectiveness of Counsel: Records: Claims: Appeal and Error.** In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

9. **Effectiveness of Counsel: Proof.** To show deficient performance under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant claiming ineffective assistance of counsel must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

10. **Criminal Law: Intoxication: Mental Competency.** As a matter of law, voluntary intoxication is not a complete defense to a crime, even when it produces psychosis or delirium.

11. **Criminal Law: Insanity: Intent.** Although there is but one type of insanity which will support a finding of not guilty or not responsible by reason of insanity, there are a variety of mental conditions which bear upon the ability to form a specific intent.

12. **Drunk Driving: Blood, Breath, and Urine Tests.** Evidence of a driver's refusal to submit to a warrantless blood draw is admissible in a prosecution for driving under the influence.

13. **Criminal Law: Evidence.** A death certificate, standing alone, is not competent evidence of the cause of death in a controversy where the cause of death is a material issue.

14. **Criminal Law: Appeal and Error.** Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.

15. **Appeal and Error.** It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires a reversal.

Appeal from the District Court for Garden County: Derek C. Weimer, Judge. Affirmed.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Funke, J.

Edward Hood appeals from his convictions for motor vehicle homicide, manslaughter, driving under the influence of alcohol causing serious bodily injury, and refusal to submit to a preliminary breath test. The court sentenced Hood to consecutive terms totaling between 73 and 75 years' imprisonment. We affirm the judgment of the trial court.

## BACKGROUND

In December 2013, a two-vehicle, head-on collision occurred on U.S. Highway 26 in Garden County near Oshkosh, Nebraska. Hood was driving one of the vehicles; the driver of the other vehicle died at the scene, and the passenger of that vehicle survived after being in a coma for 9 days and sustaining extensive injuries.

After the accident, an off-duty Nebraska State Patrol trooper who came upon the accident asked Hood what happened and Hood said that just prior to the accident, he was looking out the window at a large flock of birds and when he looked back at the road, he suddenly observed a car in front of him. A trained emergency medical technician and volunteer firefighter who attended to Hood later testified he smelled a "[v]ery strong" odor of alcohol coming from Hood.

Garden County Deputy Sheriff Dwight Abbott helped Hood into the front seat of Abbott's cruiser and drove Hood to a local hospital. Abbott did not arrest or restrain Hood at that time. Abbott testified that during the drive, he smelled alcohol coming from Hood and noticed Hood's speech was slow and

his eyes were bloodshot. Hood told Abbott that the accident happened "real fast" after he "looked out the window and saw the birds."

Meanwhile, officers at the scene continued to investigate the accident. There was evidence that Hood's vehicle had swerved across the oncoming lane of traffic and drove off that side of the roadway for about 60 feet, then crossed all the way back through his lane and past the shoulder line, and then made a heavy overcorrection and turned back across his lane and entered the oncoming lane of traffic. The victim who was driving pulled onto the shoulder to attempt to evade Hood, but Hood's vehicle was traveling "completely sideways" when its front passenger side struck the front driver's side wheel of the other vehicle. There was no indication that Hood ever applied the brakes.

Garden County Chief Deputy Sheriff Randy Ross testified that he opened Hood's vehicle and smelled a sweet, alcoholic odor. Ross located a bottle of brandy, which was two-thirds full, in a bag behind the center console. Ross relayed this information to Abbott, and Abbott questioned Hood about the accident while they were at the hospital.

Abbott asked Hood if he had been drinking. Hood replied that "he drank four beers last night" and said that "last night was a hard night." Abbott asked Hood to take a preliminary breath test, and after Hood refused, Abbott placed Hood under arrest for driving under the influence. Abbott read Hood the "Post-Arrest Chemical Test Advisement Form" and then asked Hood to submit to a blood test. Hood refused, stating he was a recovering heroin addict and "doesn't do needles."

Hood was then turned over to medical personnel. Tracy Ray, a physician assistant at the hospital, examined and treated Hood. Ray was initially at the accident scene, but then went to the hospital in order to treat those injured in the accident. Ray testified that Hood had bloodshot eyes, slurred speech, and alcohol on his breath. Ray drew blood from Hood, with Hood's consent, as part of a diagnostic evaluation. Law enforcement

subsequently subpoenaed the hospital and obtained Hood's blood and urine samples.

Prior to trial, Hood filed a motion to suppress the blood and urine samples collected by the hospital. The court granted Hood's motion and suppressed the subpoenaed evidence. During trial, Hood made an oral motion in limine based on the U.S. Supreme Court's decision in *Birchfield v. North Dakota*[1] to preclude the State from introducing evidence of Hood's refusal to submit to a blood test to prove the remaining charges. The court overruled Hood's motion based on this court's decision in *State v. Rask*,[2] which held that Neb. Rev. Stat. § 60-6,197 (Cum. Supp. 2016) permits evidence of refusal to prove driving under the influence (DUI) charges.

At trial, during direct examination of Ross, the State offered the victim's death certificate into evidence. The document carried the seal of the Nebraska Department of Health and Human Services and was signed by the Garden County Attorney, indicating that the victim's death was caused by "Whole [B]ody Severe Trauma" as the result of a "Two Vehicle Collision" on Highway 26 and that her death occurred at 2:52 p.m. on December 7, 2013. The court received the exhibit over Hood's objection regarding his right to confront the author of statements made in the death certificate.

The jury convicted Hood of motor vehicle homicide, manslaughter, and driving under the influence of alcohol causing serious bodily injury, and the court later found Hood guilty of refusal to submit to a preliminary breath test. Following a presentence investigation, and after the court received evidence of Hood's two prior DUI convictions from Florida and New Mexico, the district court sentenced Hood to serve consecutive terms of 49 to 50 years for motor vehicle homicide, 19 to 20 years for manslaughter, and 5 years for driving under the

---

[1] *Birchfield v. North Dakota*, ___ U.S. ___, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016).

[2] *State v. Rask*, 294 Neb. 612, 883 N.W.2d 688 (2016).

influence of alcohol causing serious bodily injury. The court gave Hood credit for time served, ordered Hood to pay a $100 fine for refusal to submit to a preliminary breath test, and revoked Hood's operator's license for a period of 15 years.

Hood filed a notice of appeal, the trial court appointed appellate counsel, and we moved the case to our docket.[3]

## ASSIGNMENTS OF ERROR

Hood assigns, restated, that (1) the performance of Hood's trial counsel was deficient and unfairly prejudiced Hood's right to a fair trial, (2) the district court erred as a matter of law in admitting evidence of Hood's refusal to submit to a blood test, and (3) the district court violated Hood's right to confrontation by admitting the victim's death certificate without sponsoring testimony.

## STANDARD OF REVIEW

[1,2] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.[4] We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.[5]

[3-5] In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the error was harmless beyond a reasonable doubt.[6] Harmless error review looks to the basis on which the jury actually rested

---

[3] See Neb. Rev. Stat. § 24-1106 (Supp. 2017).

[4] *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018).

[5] *Id.*

[6] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[7] The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[8]

## ANALYSIS

### Hood Failed to Show That Trial Counsel's Performance Was Deficient as Matter of Law

Hood argues that his trial counsel should have pursued a defense based on the theory that Hood had diminished mental capacity. Hood asserts that he may have been suffering from a mental illness and used alcohol as self-medication. He suggests that following the collision, he was acting confused and erratic and was making strange and nonsensical statements, and that therefore, he was possibly suffering from psychosis, schizophrenia, or bipolar disorder. Hood claims that "the record contained evidence that, if fully developed, would have supported a defense based on diminished capacity"[9] and that Hood could have argued he had been rendered unable to distinguish right from wrong.

The State argues that Hood's allegations are insufficient, because Hood did not allege that he actually lacked the ability to distinguish right from wrong, but merely asserted that "trial counsel did not explore the potential application"[10] of a diminished capacity defense. The State argues the record refutes Hood's ineffective assistance of counsel allegations.

---

[7] *Id.*

[8] *Id.*

[9] Brief for appellant at 12.

[10] *Id.*

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.[11]

[6] However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[12] Such a claim may be resolved when the record on direct appeal is sufficient to either affirmatively prove or rebut the merits of the claim.[13] The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[14]

[7,8] When making an ineffective assistance of counsel claim on direct appeal, allegations of prejudice are not required.[15] However, a defendant must make specific allegations of the conduct that he or she claims constitutes deficient performance.[16] In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[17] A claim insufficiently stated is no different than a claim not stated at all.[18]

---

[11] *Cotton, supra* note 4.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016).

[16] *Id.*

[17] *Cotton, supra* note 4.

[18] *Id.*

[9] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[19] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[20] To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[21] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[22] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[23] The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.[24] We will not second-guess trial counsel's reasonable strategic decisions.[25]

In support of his argument that trial counsel should have pursued a diminished capacity defense, Hood claims there is evidence that he was in a state of confusion at the scene and after the accident. Hood points to the testimony of Ray, the physician assistant, who observed Hood to have "delayed cognitive responses" and stated that when he asked Hood a question, "there was a period of time before he would give me an answer." Ray said that meant that Hood was confused, because "anytime we have somebody that has repetitive questions or inaccurate answers to the same question, that's a state of confusion for some reason."

---

[19] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[20] *Cotton, supra* note 4.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] See *State v. Foster*, 300 Neb. 883, 916 N.W.2d 562 (2018).

Additionally, Hood referred to the fact that his explanation of watching a flock of birds just prior to the accident "made no sense, and was given to multiple officers."[26] For example, Ross testified that "[Hood] told me he was just looking at the birds that were flying overhead and I believe during that meeting he, he told us that it was God's time for her to go," referring to the deceased victim.

Hood does not allege that the facts of this case would have satisfied an insanity defense based on Neb. Rev. Stat. § 29-2203 (Reissue 2016). The fact that a defendant has some form of mental illness or defect does not by itself establish insanity.[27] Section 29-2203 was amended to provide that "insanity does not include any temporary condition that was proximately caused by the voluntary ingestion, inhalation, injection, or absorption of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof."[28]

[10] Hood does not argue his counsel should have pursued a defense based on intoxication under Neb. Rev. Stat. § 29-122 (Reissue 2016). Section 29-122 states in part:

> Intoxication is not a defense to any criminal offense and shall not be taken into consideration in determining the existence of a mental state that is an element of the criminal offense unless the defendant proves, by clear and convincing evidence, that he or she did not (1) know that it was an intoxicating substance when he or she ingested, inhaled, injected, or absorbed the substance causing the intoxication or (2) ingest, inhale, inject, or absorb the intoxicating substance voluntarily.

Voluntary intoxication is not a complete defense to a crime, even when it produces psychosis or delirium.[29]

---

[26] Brief for appellant at 12.

[27] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

[28] § 29-2203(4). See 2011 Neb. Laws, L.B. 100, § 2.

[29] *State v. Hotz*, 281 Neb. 260, 795 N.W.2d 645 (2011).

[11] Instead, Hood argues that evidence of his diminished mental capacity could have rebutted evidence that he acted with criminal intent.[30] We have held that separate and apart from an insanity defense, a defendant may, with appropriate evidence, try to defeat the charge filed against him or her by proving that at the time the offense occurred, the defendant lacked the ability to intend the voluntary and probable consequences of his or her act.[31] In *State v. Vosler*,[32] we noted that "although there is but one type of insanity which will support a finding of not guilty or not responsible by reason of insanity, there are a variety of mental conditions which bear upon the ability to form a specific intent."

However, we agree with the State that the record affirmatively shows that Hood's mental capacity was not a factor in the collision. For example, during the hearing on Hood's motion to suppress, Ray testified that he evaluates a patient's competency prior to conducting a blood draw, that he advised Hood of his rights and found Hood to be capable of consenting, and that Hood consented to a blood draw. In addition, Ray testified that Hood asked for a telephone to call his mother and told his mother that he "needed a lot of money and he was in trouble." Further, Hood was able to provide his medical history to Ray and was able to inform a State Patrol trooper that he believed he had suffered a broken ankle.

The record related to Hood's sentencing also demonstrates that Hood did not have a viable diminished capacity defense. The district court reviewed Hood's presentence investigation report and considered Hood's "mentality" and whether he "contemplated causing serious harm" in determining Hood's sentence. The court reviewed evidence of Hood's difficult upbringing and family history, problems with substance abuse

---

[30] See *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984).

[31] *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999); *Vosler, supra* note 30.

[32] *Vosler, supra* note 30, 216 Neb. at 468, 345 N.W.2d at 811.

from an early age, criminal record, and unsuccessful participation in state programs. The court did not conclude that Hood lacked the ability to distinguish between right and wrong. Rather, the court described Hood as a "recidivis[t] drunk driver" and stated:

> [Y]ou absolutely meant to get in the car. You absolutely meant to do that and once you made that decision, once that decision was made . . . it was game on for every other driver on the road and [the victims] didn't ask to play. They were involuntary actors in your decision to drink and to drive. It was your choice. . . . You choose to drink. You choose to drive and these poor people happened to be in the wrong place at the wrong time.

We also note that pursuant to Neb. Rev. Stat. § 29-1823 (Reissue 2016), the court had the authority to determine Hood's competency. The court had the case from 2014 to 2017, and the record does not show that the State, Hood, or Hood's counsel requested a competency evaluation. The most likely explanation as to why Hood's mental capacity was not explored is because a diminished capacity defense would have lacked merit.

We find the record refutes the allegations that the performance of trial counsel was deficient. The testimony of Ray and the unchallenged comments of the court at sentencing provide that counsel's decision not to pursue the mental capacity issue was not inconsistent with the conduct of a lawyer with ordinary training and skill. There is no basis from the record to conclude that Hood's mental capacity at the time of the accident would have negated his criminal liability.

Furthermore, we find that Hood's generalized allegations of deficient performance are insufficient. Hood alleged in a conclusory fashion that raising a diminished capacity defense "would have favorably impacted his criminal liability."[33] But Hood did not allege that he actually lacked capacity for a

---

[33] Brief for appellant at 14.

specific reason. Rather, Hood's claim is that based on his behavior, he might have been suffering from psychosis, schizophrenia, or bipolar disorder. Absent specific allegations, Hood's ineffective assistance of counsel claim effectively becomes a discovery motion to determine whether evidence favorable to a defendant's position actually exists.[34]

We conclude that the record refutes Hood's claim and that his claim is insufficiently raised. Therefore, Hood has failed to state a claim that the performance of his trial counsel was deficient as a matter of law. This assignment of error is without merit.

## EVIDENCE OF DRIVER'S REFUSAL TO WARRANTLESS BLOOD DRAW IS ADMISSIBLE IN DUI PROSECUTION

Hood's second assignment of error argues that *Birchfield* categorically prohibits the use of evidence in a DUI prosecution that a defendant refused to consent to a warrantless blood draw.[35] Hood argues that even though the crash in this case occurred years before *Birchfield*, Hood's trial occurred after *Birchfield* became law, and that as a result, the jury should not have been permitted to consider evidence that Hood refused to submit to Abbott's request for a blood test. Hood argues the jury should not have been allowed to "infer guilt in such ambiguous circumstances, particularly involving the exercise of a constitutional right."[36]

Hood's argument runs headlong into § 60-6,197(6), which states, "[r]efusal to submit to a chemical blood, breath, or urine test or tests pursuant to this section shall be admissible evidence in any action for a violation of section 60-6,196 . . ." The district court acknowledged that in *Rask*, we found that § 60-6,197(6) "is a broad rule, without exception—it states

---

[34] See, *Foster, supra* note 25; *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[35] See *Birchfield, supra* note 1.

[36] See *State v. Gauthier*, 174 Wash. App. 257, 265, 298 P.2d 126, 131 (2013).

only that a refusal is admissible to prosecute a DUI"[37] and held that under § 60-6,197(6), even uninformed refusals to submit to a chemical test are admissible for the purpose of proving DUI charges. We determined that a defendant's refusal to submit to a chemical test is evidence of the circumstances surrounding a DUI charge and said that a refusal showed the "'defendant's conduct, demeanor, statements, attitudes, and relation toward the crime.'"[38]

Hood's brief does not address § 60-6,197(6) and does not assert that § 60-6,197(6) is unconstitutional, and the State does not argue that we should interpret Hood's argument as a constitutional challenge to the statute. The record further indicates that Hood has not preserved an argument regarding the constitutionality of § 60-6,197(6), either facially or as applied to Hood, because Hood did not file a notice of constitutional question pursuant to Neb. Ct. R. App. P. § 2-109(E) (rev. 2014).

Because Hood does not question the constitutionality of § 60-6,197(6), in addressing his assignment of error, we find it appropriate to reiterate our decision in *Rask* in light of the U.S. Supreme Court's decision in *Birchfield*. We did not rely upon *Birchfield* in our decision in *Rask*, because the case was briefed and argued prior to *Birchfield*. We take this opportunity to discuss the *Birchfield* decision and its implications on Nebraska law in the context of the evidentiary concern raised by Hood.

In *State v. McCumber*,[39] we considered the extent to which portions of § 60-6,197 have been invalidated by the U.S. Supreme Court's decision in *Birchfield*. Unlike Hood's case, *McCumber* involved a conviction on a charge of refusing to submit to a blood test. We held that the defendant's conviction

---

[37] *Rask, supra* note 2, 294 Neb. at 620, 883 N.W.2d at 695.

[38] *Id.* at 621, 883 N.W.2d at 696 (quoting *State v. Meints*, 189 Neb. 264, 202 N.W.2d 202 (1972)).

[39] *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017).

for refusal under § 60-6,197 was unconstitutional as applied
to him based on *Birchfield*, because the only basis offered by
the State to demand a blood test from the defendant was that
he could be searched incident to a lawful arrest for drunk driv-
ing or that he had consented to a blood test under Nebraska's
implied consent laws.[40] However, we held that § 60-6,197 is
facially constitutional, because there are circumstances under
which a conviction for refusal under § 60-6,197 would be valid
even after *Birchfield*. We explained that a charge for refusal
to submit to a chemical test could be valid if law enforcement
has obtained a warrant to conduct a blood draw or if exigent
circumstances exist such that there is no time to secure a war-
rant.[41] Therefore, *Birchfield* limited the legal force and effect
of § 60-6,197 only to the extent that warrantless blood draws
and prosecutions of a refusal to submit to a warrantless blood
draw cannot be justified as part of a search incident to arrest or
based on implied consent.

In *State v. Hoerle*,[42] we examined in detail *Birchfield*
and its implications on Nebraska law. We explained that
*Birchfield* did not categorically prohibit a warrantless blood
draw based on a driver's actual consent and that a court
must consider the totality of the circumstances to determine
whether a driver's consent to a blood test was freely and
voluntarily given.[43] We acknowledged that warrantless blood
draws based on a search incident to arrest or implied consent
could not be constitutionally justified, but concluded that the
good faith exception applies to pre-*Birchfield* blood draws of
this nature.[44]

---

[40] *Id.*

[41] *Id.*

[42] *State v. Hoerle*, 297 Neb. 840, 901 N.W.2d 327 (2017), *cert. denied* ___
U.S. ___, 138 S. Ct. 1986, 201 L. Ed. 2d 248 (2018).

[43] *Id.*

[44] *Id.* See, also, *State v. Nielsen, ante* p. 88, ___ N.W.2d ___ (2018); *State v.
Hatfield*, 300 Neb. 152, 912 N.W.2d 731 (2018).

Though we have not yet specifically addressed the propriety of admitting evidence of a driver's refusal in a criminal DUI proceeding post-*Birchfield*, the *Birchfield* Court shed light on the issue when it stated that "[o]ur prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. . . . Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them."[45] As a result, we do not read the *Birchfield* Court's decision as placing restrictions on the use of evidence of a driver's refusal in a DUI proceeding.

The *Birchfield* Court was primarily concerned with the heightened privacy interests implicated by blood tests, which are more physically invasive than breath tests and provide law enforcement a sample that can be preserved and processed to provide more information about an individual than is provided by a breath test.[46] After recognizing the substantial privacy concerns presented by blood draws and concluding the search incident to arrest exception does not apply to warrantless blood tests, the Court considered whether implied consent statutes qualified as a consent exception to the requirement for a warrant. The Court stated that "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads"[47] and concluded that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense."[48] The Court did not go on to conclude, as Hood argues, that the Fourth Amendment prohibits the use of evidence of a defendant's refusal in a

---

[45] *Birchfield, supra* note 1, 136 S. Ct. at 2185.

[46] See *id.*

[47] *Id.*, 136 S. Ct. at 2185.

[48] *Id.*, 136 S. Ct. at 2186.

DUI criminal proceeding, particularly where the defendant has not been charged with the crime of refusal and no blood draw has taken place.

Several state courts have been confronted with the very issue raised by Hood and have acknowledged that the Fourth Amendment does not bar the admission of evidence of refusal to submit to a warrantless blood draw.[49] For example, the Supreme Court of Vermont reasoned that criminalizing refusal poses qualitatively different Fourth Amendment concerns than merely allowing evidence of the refusal at a criminal DUI trial.[50] Even though the State is permitted to use a defendant's refusal as circumstantial evidence of guilt, a defendant has a full opportunity to explain the basis for refusal to the jury.

In this case, the State argued that Hood refused because "[h]e knows he's in trouble." Based on the record, Hood could have rebutted this argument by explaining that he refused because he is a recovering heroin addict and "doesn't do needles" and that he later offered to provide Abbott a blood sample but Abbott declined.

[12] In summary, *Birchfield* itself clarified that the propriety of evidentiary consequences for a driver's refusal to submit to a blood draw should not be questioned. If Hood's position were the law, no drunk driver would ever submit to a blood test. Therefore, consistent with our decision in *Rask*, we join the courts which have concluded that evidence of a driver's refusal to submit to a warrantless blood draw is admissible in a DUI prosecution. Hood's assignment of error is without merit.

---

[49] See, *State v. Rajda*, Nos. 2017-051, 2017-126, 2018 WL 3494646 (Vt. July 20, 2018); *MacMaster v. State*, 344 Ga. App. 222, 809 S.E.2d 478 (2018); *State v. Storey*, 2018 NMCA 009, 410 P.3d 256 (2017); *Fitzgerald v. People*, 394 P.3d 671 (Colo. 2017), *cert. denied* ___ U.S. ___, 138 S. Ct. 237, 199 L. Ed. 2d 122.

[50] See *Rajda, supra* note 49.

### Court's Error in Admitting Death Certificate Without Supporting Testimony Was Harmless

In his third assignment of error, Hood claims the district court erred in admitting a death certificate, without a supporting witness, in a case wherein the time, place, and manner of death are necessary elements of the charged offenses. Hood argues that statements made in the death certificate were testimonial in nature and that therefore, he had a right to confront the author of the statements.

During direct examination of Ross, the State detoured from questioning Ross to offer the victim's death certificate into evidence. The following exchange took place:

> [State]: Your Honor, the State would also see[k] to offer the Certificate of Death of [the victim]. It is authenticated. It does have a seal here.
>
> THE COURT: [Defense counsel?]
>
> [Defense counsel]: Judge, objection, confrontation.
>
> THE COURT: The objection is overruled. The court will receive Exhibit 49.

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Hood argues the Sixth Amendment required exclusion of the death certificate based on the U.S. Supreme Court's decision in *Crawford v. Washington*,[51] which generally held that an out-of-court testimonial statement of an unavailable declarant is not admissible at a criminal trial unless a defendant had a prior opportunity to cross-examine the declarant. Hood argues that statements made by the Garden County Attorney in the victim's death certificate were testimonial in nature and that the court had not found the Garden County Attorney to be unavailable to provide testimony.

---

[51] *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[13] Nebraska has historically not followed the rule which permits a death certificate to be received in evidence as presumptive evidence of the facts stated therein.[52] This court has held, even in the civil context where the confrontation clause is not at issue, that a death certificate, standing alone, is not competent evidence when offered as proof of the cause of death in a controversy where the cause of death is a material issue.[53]

In *Vanderheiden v. State*,[54] we extended this rule to the criminal context based on a Confrontation Clause rationale. We found that "death certificates are made ex parte without a hearing and without the right of cross-examination" and found that the certificate was not admissible to prove the cause of death.[55]

In *Skinner v. Jensen*,[56] we applied the rule from *Vanderheiden* to a habeas corpus proceeding in which the relator challenged the sufficiency of evidence produced at a preliminary hearing. The relator was being held on a charge of manslaughter, and the only evidence to establish the death or cause of death of the victim was a death certificate. We found that the death certificate was not competent evidence and that therefore, there was insufficient evidence to sustain a finding that manslaughter had been committed, and we noted that the State could file a new complaint and present additional evidence at a future hearing.[57]

Based on our prior line of cases, we determine that the trial court erred in admitting the victim's death certificate without

---

[52] See *McNaught v. New York Life Ins. Co.*, 145 Neb. 694, 18 N.W.2d 56 (1945).

[53] *McNaught, supra* note 52; *Omaha & C. B. Street R. Co. v. Johnson*, 109 Neb. 526, 191 N.W. 691 (1922).

[54] *Vanderheiden v. State*, 156 Neb. 735, 57 N.W.2d 761 (1953).

[55] *Id*. at 744, 57 N.W.2d at 767.

[56] *Skinner v. Jensen*, 178 Neb. 733, 135 N.W.2d 134 (1965).

[57] *Id*.

supporting testimony from the author, regardless of whether the statements made in the death certificate were testimonial in nature or whether the Confrontation Clause required exclusion of the evidence. We determine, however, the court's error was harmless beyond a reasonable doubt, because the time, place, and cause of the victim's death were not contested issues in this case; the death certificate was cumulative of other evidence on these issues; the jury's guilty verdict was surely unattributable to the court's error; and there was properly admitted evidence to support the jury's finding.

[14,15] Our harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.[58] It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires a reversal.[59] When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.[60]

There was no dispute that one of the victims in this case was deceased. Nor was there a dispute about the time and place of the victim's death. Ross testified that when he arrived on the scene, a man yelled at him to get over to the victim's vehicle and said he thought "the driver was gone but the passenger was still alive and breathing." Ross went to the victim's vehicle and found that the driver had no pulse, so he focused on the passenger. Ross testified that he told Ray that officers had "one critically injured on their way to the hospital, one fatality and one with a broken ankle." A chief deputy sheriff, who was also at the scene of the collision, testified that after leaving the scene, officers went to the funeral home with the deceased victim.

---

[58] *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018).

[59] *Id.*

[60] *Id.*

There was also no dispute about the cause of the victim's death. Hood's vehicle collided with the front driver's side of the deceased victim's vehicle. Ross testified that after the accident, the deceased victim's body was "in a state of brokenness." Defense counsel did not focus on whether a death occurred based on the collision, but on whether the collision was the result of Hood's intoxication or whether Hood accidentally lost control of his vehicle due to distracted driving.

Although the State offered the death certificate into evidence, the State did not expressly rely on the death certificate to establish a fact in issue. Hood correctly described the admission of the death certificate as a "detour[]"[61] from the other evidence presented. The State never referred back to the death certificate after it was admitted. We agree with the State that the death certificate was cumulative of other evidence of the time, place, and cause of the deceased victim's death. We therefore conclude that the court's admission of the death certificate was harmless beyond a reasonable doubt. This assignment of error is without merit.

## CONCLUSION

We conclude that Hood failed to state an ineffective assistance of counsel claim as a matter of law. Further, we conclude that evidence of a driver's refusal to submit to a warrantless blood draw is admissible in a DUI prosecution. Lastly, we conclude that the trial court's error in admitting the victim's death certificate without supporting testimony was harmless beyond a reasonable doubt. We therefore affirm Hood's convictions and sentences.

Affirmed.

Freudenberg, J., not participating.

---

[61] Brief for appellant at 9.